```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION


ACT II JEWELRY, LLC, a         |
Delaware Limited Liability     |
Corporation d/b/a Lia          |
Sophia; and KIAM EQUITIES      |
CORPORATION, a Delaware        |
Corporation,                   |

                Plaintiffs,    |

         v.                    |

ELIZABETH ANN WOOTEN;          |
ADORNABLE-U, LLC, a Delaware   |
Limited Liability Company;     |
NICOLE MEAD; SHANNON ECKELS;   |
and BECKA DAUN,                |        Case No. 15 C 6950

                Defendants.    |   Judge Harry D. Leinenweber
_____|

ELIZABETH ANN WOOTEN;          |
ADORNABLE-U, LLC, a Delaware   |
Limited Liability Company;     |
NICOLE MEAD; and SHANNON       |
ECKELS,                        |

     Counterplaintiffs/        |
     Third-Party Plaintiffs,   |

         v.                    |

ACT II JEWELRY, LLC, a         |
Delaware Limited Liability     |
Company; and KIAM EQUITIES     |
CORP., a Delaware              |
Corporation; VICTOR K.         |
KIAM III; and ELANA KIAM,      |

     Counterdefendants/        |
     Third-Party Defendants.   |
```

## MEMORANDUM OPINION AND ORDER

There are several motions currently pending in this case. In this opinion the Court addresses Defendants Wooten and Adornable-U's Motion to Dismiss [ECF No. 48], and Defendants Mead, Eckels and Daun's Motion to Dismiss [ECF No. 51]. The Court will address Defendants Wooten and Adornable-U's Motion for Expedited Declaratory Judgment Hearing and Preliminary Injunction [ECF No. 55], and Counterdefendants and Third-Party Defendants' Motion to Dismiss Certain Counts of the Counterclaim and Third-Party Complaint [ECF No. 64] in a separate opinion. For the reasons stated herein, Defendants Wooten and Adornable-U's Motion and Defendants Mead, Eckels and Daun's Motion are granted in part and denied in part.

## I.  BACKGROUND

Prior to December 2014, Act II Jewelry, LLC (formerly DBA "Lia Sophia") ("Act II") distributed fashion jewelry through a "party plan" business model, in which a network of sales representatives ("Sales Advisors") marketed the jewelry by holding parties in customers' homes. Elizabeth Wooten ("Wooten") was Act II's Vice President of Product Development from July 2011 until February 9, 2015. In this role, Wooten selected, developed and designed Act II's complete line of jewelry, and managed a team of Act II employees who were responsible for developing Act II's jewelry collections. Wooten

earned a yearly salary of $262,500, and was eligible for significant bonuses and other benefits.

At the time she was hired by Act II, and throughout the course of her employment, Wooten entered into several contracts with Act II and/or Kiam Equities Corporation ("KEC"). First, at the outset of her employment, on July 25, 2011, Wooten executed a Confidentiality, Non-Disclosure and Developments Agreement (the "Confidentiality Agreement"). Under this agreement, Wooten was prohibited from "directly or indirectly, either during or after the term of employment, divulge[ing] any Trade Secrets to any person or business entry, []or us[ing] or permit[ing] the use of any Trade Secrets, other than pursuant to [her] employment on behalf of [Act II]." Second Amended Verified Complaint ("SAVC") Ex. B ¶ 1(a)(3), ECF No. 3-3. Wooten also agreed that, during her employment and for 24 months thereafter, she would not divulge, use or permit the use of "any Confidential Information, other than pursuant to Employee's active employment for and on behalf of Company. . . ." *Id.* at ¶ 1(b)(3) ("Confidentiality Clause"). Finally, Wooten agreed that any "inventions, improvements, discoveries, developments, concepts and ideas ("Developments")" would at all time be and remain the property of Act II. *Id.* at ¶ 4 ("Assignment Clause"). The Confidentiality Agreement contained a "Separability and Modification" provision allowing invalid or

unenforceable portions of the Agreement to be modified or restricted to the extent necessary to render the Agreement valid and enforceable. *Id.* at ¶ 7.

On October 28, 2011, Wooten entered into a "Loan Agreement" with Act II and KEC, pursuant to which she was lent $300,000. SAVC Ex. C ¶ 1, ECF No. 3-3. As consideration for the loan, Wooten agreed to repay to KEC the principal amount of the loan, plus interest. *Id.* at ¶¶ 2-4. The Loan Agreement further provided that if Wooten was "still employed with [Act II] on February 25, 2015," or if her employment with Act II was "terminated without 'cause' (as defined in the Compensation Letter)," KEC would forgive her obligation to repay any remaining debt. *Id.* ¶ 5. The "Compensation Letter" was a letter agreement entered into simultaneously with the Loan Agreement; it defined termination for "cause" as "gross negligence or willful misconduct." SAVC Ex. D ¶ 4, ECF No. 3-3. The Loan Agreement called for repayment of any unpaid principal and interest upon any "Default Event," which specifically included Wooten's termination for cause. SAVC Ex. C ¶ 6, ECF No. 3-3.

On December 1, 2014, Act II announced it would be winding down its direct-selling, party plan jewelry business in the United States and Canada and its Sales Advisors would be selling its Fall/Winter 2014 collection at discounted prices through

December 31, 2014. Despite this decision, Act II continued its efforts to develop jewelry collections through 2014. In fact, during that time, Wooten and her team designed and selected jewelry and created mock-ups for a Spring/Summer 2015 collection, which Wooten showcased to certain Act II Sales Advisors in October 2014. On October 27, 2014, while Wooten was working on this collection, she and Act II entered into a Key Employee Incentive Bonus Agreement (the "Incentive Agreement"), which provided certain incentives for Wooten to remain employed with Act II during the wind-up period.

Under the terms of the Incentive Agreement, Wooten would receive substantial separation benefits in the form of a lump-sum severance payment of $135,000 and an additional bonus of up to $500,000 based on sales of Act II's inventory. SAVC Ex. E ¶ 2(a)(i)-(ii), ECF No. 3-4. In order to qualify for these benefits, Wooten could not be terminated for "cause." *Id.* at ¶ 2(a), (d). A termination was for cause if based on, among other things:

> (ii) Employee's breach of any term of the Confidentiality, Non-Disclosure and Developments Agreement between Employee and [Act II] dated July 25, 2011 (the "Restrictive Covenants") during the Term of this Agreement except as outlined in Section 3 below; (iii) Employee's willful misconduct or gross negligence that has a material effect on the interests or reputation of [Act II] or its affiliates; (iv) Employee's breach of Section 4 of this Agreement [related to best efforts and full-time attention] as determined within the Company's sole discretion; . . . or (vi) Employee's participation in any act of fraud,

misappropriation or disloyalty relating to or involving the Company in any material way.

*Id.* at ¶ 2(e). In Section 3 of the Incentive Agreement, Wooten acknowledged and reaffirmed the restrictive covenants contained in the Confidentiality Agreement. *Id.* at ¶ 3. Section 4 of the Agreement required Wooten to "devote her best efforts and substantially all of her business time, attention and energies to advance the interests of the Company and perform her duties" under the Incentive Agreement. *Id.* at ¶ 4. This section also prohibited Wooten from engaging in "outside professional activities that would interfere with the performance of her duties" under the Agreement. *Id.* The Incentive Agreement could not be modified or amended, except by a written agreement signed by both Parties (and any guarantor). *Id.* at ¶ 7(f).

Wooten desired to continue working as a jewelry designer after the wind-up of Act II's business; Act II was aware of this and carved out for such activities in the Incentive Agreement. Section 3 stated that nothing "in this Agreement, the Restrictive Covenants or the Prior Employment Agreements" would prevent Wooten "from continuing her work as a jewelry designer," as long as she did not "infringe on any intellectual property belonging to" Act II. *Id.* ¶ 3. Act II told Wooten that her new company should not begin operations until after Act II's direct-selling operations concluded; the Incentive Agreement had a termination date in late February 2015. Three days after

signing the Incentive Agreement, on October 30, 2014, Wooten incorporated Adornable-U ("AU"), a direct-selling jewelry business.

Wooten wanted to recruit former Act II Sales Advisors to work for AU, but knew she had to do so quickly before they went to work for another direct-selling company. To entice them, she promised that if they came to work for AU, they could start holding parties in mid-January 2015 and they would receive their first check on February 1, 2015. This left Wooten with insufficient time to develop a new jewelry collection, so she chose to sell Lia Sophia styles and items from Act II's Spring/Summer 2015 collection. To obtain the pieces she needed, Wooten encouraged Act II to return certain styles of its unsold jewelry inventory to its unsecured creditor-vendors in partial satisfaction of its outstanding debts. Wooten then reached out to these same vendors and purchased the styles for AU. Wooten never disclosed to Act II that she intended to buy the jewelry that Act II had returned to vendors and sell it through her new company. Indeed, when Act II employees Tory Kiam and Elena Kiam asked Wooten about the product line for her new company, Wooten merely stated that it would have a "bohemian" style.

In mid-December 2014, Wooten invited a group of former Act II Sales Advisors, including Defendants Eckels and Mead, to her apartment to preview some of the jewelry that would be part of

AU's first collection.  At the meeting, the attendees were shown the jewelry line for AU, which included many pieces Act II had either offered for sale in the past or were part of the Spring/Summer 2015 collection Wooten had developed for Act II. In January 2015, at another meeting attended by Mead, Eckels, Defendant Daun, and several other Act II Sales Advisors, whom Wooten had recruited to join AU, attendees assisted Wooten in assembling AU starter kits.  Some of the jewelry pieces used for the kits still had Lia Sophia tags on them or were stamped "Lia Sophia."  Mead informed attendees that the AU product line and starter kits could contain Lia Sophia branded styles because Wooten had designed the items and she had permission to sell the styles.  After the meeting, Eckels took home several hundred pieces of jewelry to remove the Lia Sophia tags to prepare them for sale by AU.

Shortly thereafter, Wooten completed a Spring/Summer 2015 product catalog for AU.  The catalog featured 99 pieces of jewelry that were identical to, or only slight variations of, designs that had been published in the Act II 2014 Fall/Winter Style Guide, including styles Wooten had developed for the company.  Some pieces also were contained in the layout for Act II's Spring/Summer 2015 collection.  Certain Act II styles offered by AU in its catalog were on back order and Act II was

unable to fill orders for these products because it had sold back the items from its inventory.

During this same time period, Act II began to receive information from the marketplace indicating a misperception that AU was a continuation of Act II, or that Act II's owners were supporting the company, or that AU was selling Act II jewelry designs. Specifically, two Facebook posts on a page titled "Adornable.u Jewelry & Accessories" stated:

- Lia Sophia went out of business this past December 2014! . . . *This is a BRAND NEW JEWELRY COMPANY & OWNED by the designer of. . . . "Lia Sophia!" *YES . . . there are MANY styles being carried over from Lia Sophia with . . . 40% LOWER pricing!!!
- [A]dornable.u is made by the same designers and manufacturers that brought you Lia Sophia, so you can expect the same timeless style and quality!

Act II also received communications from the field expressing confusion that the Act II Spring/Summer 2015 collection, which Wooten had shown Act II Sales Advisors in late 2014, was now appearing in the catalog for AU. This confusion was so acute that, on January 24, 2015, Act II was forced to issue a statement to its Sales Advisors to clarify that Act II's owners were not investors in AU and that there was no affiliation between the companies.

In a cease and desist letter dated January 29, 2015, Act II's counsel demanded that AU immediately cease any efforts to sell or market jewelry based in whole or in part on the

designs of Act II. Counsel further advised Wooten that her conduct appeared to violate her contracts with Act II and that, should she not comply with Act II's demands, she would be terminated for cause. Act II made numerous, subsequent verbal and written attempts to obtain Wooten's compliance with her legal obligations, all to no avail. Accordingly, by letter dated February 9, 2015, Act II terminated Wooten's employment for cause, made demand on behalf of Act II and KEC for repayment of the $300,000 loan, plus interest, and notified Wooten that it intended to file litigation to address the breaches of her legal obligations.

Plaintiffs commenced this lawsuit in the Circuit Court of Cook County, Illinois on March 20, 2015, alleging numerous claims against Wooten and AU. On March 27, 2015, Plaintiffs' counsel emailed a letter and a copy of the initial complaint and exhibits to a list of individuals believed to be AU Sales Advisors, including Eckels, Mead and Daun, notifying them of the litigation and instructing them to preserve relevant information. Plaintiffs' counsel emailed another letter to this group of individuals on May 7, 2015 advising them that Wooten and AU had recently disclosed in court papers that the AU sales network was selling Act II jewelry styles. This letter also contained a copy of Wooten's Confidentiality Agreement and a copy of the then-current AU catalog. Eckels, Mead and Daun

continued to market and sell for AU, despite the March 27, 2015 and May 7, 2015 warning letters. Plaintiffs then filed the SAVC adding claims against Eckels, Mead and Daun for violations of the Illinois Trade Secrets Act ("ITSA"), civil conspiracy, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), and tortious interference with contract. Defendants Wooten and AU and Defendants Eckels, Mead and Daun have filed two separate Motions seeking to dismiss all claims against them.

## II.  **ANALYSIS**

### A.  **Count I:  Breach of Confidentiality Agreement (Wooten)**

Plaintiffs bring a common law breach of contract claim based on the Confidentiality Agreement between Plaintiffs and Wooten. Wooten makes various arguments for dismissal of the Confidentiality Agreement; the Court's analysis starts (and ends) with Wooten's contention that because the written Incentive Agreement between the parties explicitly states that it "supersedes in entirety any prior written or oral agreements between the Parties," the Confidentiality Agreement is unenforceable.

An integration clause such as the one in the Incentive Agreement is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement. *Air Safety, Inc. v. Teachers Realty Corp.,*

706 N.E.2d 882, 886 (Ill. 1999). Plaintiffs were free to negotiate a contract omitting the integration clause. They did not, and are therefore bound by their bargain. The plain and unambiguous language of the Incentive Agreement makes clear that the parties intended that, by operation of the above integration clause, Wooten's obligations under the Confidentiality Agreement were superseded by the Incentive Agreement. The later contract specifically terminated the earlier Confidentiality Agreement; therefore, there can be no claim for breach based on Wooten's duties pursuant to the Confidentiality Agreement. *GCIU Emp. Ret. Fund v. Chicago Tribune Co.,* 66 F.3d 862, 865 (7th Cir. 1995). Count I is dismissed with prejudice.

That said, the Court is cognizant that the Incentive Agreement acknowledged and reaffirmed the covenants contained in the Confidentiality Agreement, SAVC Ex. E ¶ 3, and stated that if Wooten breached "any term" of the Confidentiality Agreement, she would be terminated for cause. *Id.* at ¶ 2(e)(ii). These clauses effectively incorporated by reference the Confidentiality Agreement into the terms of the Incentive Agreement. Thus, although the Confidentiality Agreement is obsolete, Wooten may still be liable for violating the restrictive covenants contained therein. The viability of Plaintiffs' claims in this regard will be considered in

conjunction with their claim for breach of the Incentive Agreement.

## B.  Count II:  Breach of Loan Agreement (Wooten)

Wooten argues that Count II fails to state a claim because it relies on an outdated and superseded Loan Agreement (dated October 25, 2011).  Wooten claims this agreement was superseded by a later Loan Agreement, dated October 28, 2011, which makes clear that Wooten did not have to repay the alleged loan so long as she remained employed with Act II through December 31, 2014. The October 28 Loan Agreement was attached to previous versions of the Complaint, in which Plaintiffs alleged that it was a "true and correct copy" of the Loan Agreement.  Verified Complaint ("VC") Ex. C ¶ 5, ECF No. 2-3.  The document makes clear that it supersedes and replaces all prior agreements relating to the loan. Wooten was still employed with Act II on December 31, 2014.  Thus, under the October 28 Loan Agreement, the $300,000 loan is forgiven and Plaintiffs have no right to seek repayment.

Be that as it may, the existence of another Loan Agreement and the determination as to which document governs are questions of fact that cannot be decided on a motion to dismiss. Plaintiffs allege in the SAVC that the October 25 Loan Agreement is a valid contract between the parties and that Wooten is liable pursuant to its terms; the October 25 Loan Agreement is

attached to the SAVC and is consistent with the allegations. Although the October 28 Loan Agreement was attached to the VC (and therefore is available in the record), it is outside the scope of the Court's review on a motion to dismiss. *See, Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir. 1998). If, after discovery, Wooten's allegation proves true, and the October 28 Loan Agreement is the governing document between the parties, then Count II will obviously fail. But, at this juncture, the Court is bound to take all allegations in the SAVC as true and rely on the terms of the October 25 Loan Agreement. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Therefore, the Court declines to dismiss Count II.

### C. Count III: Breach of Incentive Agreement (Wooten)

In Count III, Plaintiffs assert a claim for breach of the Incentive Agreement. Wooten argues that this claim is preempted by federal copyright law. Section 301(a) of the Copyright Act provides:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). Thus, Section 301(a) expressly preempts state-created rights that are equivalent to any of the rights

established by a federal copyright. *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 674 n. 20 (7th Cir. 1986), *cert. denied,* 480 U.S. 941 (1987). Two conditions must be met for preemption of a state-created right: (1) "the work in which the right is asserted must be fixed in tangible form and come within the subject matter of copyright as specified in § 102;" and (2) "the right must be equivalent to any of the rights specified in § 106." *Id.* at 674.

It is uncontested that the works at issue here, the Lia Sophia jewelry and designs, are fixed in tangible form and come within the subject matter of copyright. *See,* 17 U.S.C. § 102. This is true despite the fact that Plaintiffs are not asserting copyrights in the jewelry or designs, and that some may not be copyrighted or even copyrightable. Preemption is intended to prevent the states from creating "copyright-like protections in materials that are not original enough for federal protection." *Toney v. L'Oreal USA, Inc.,* 406 F.3d 905, 911 (7th Cir. 2005). Thus, a state law that intrudes on the *domain* of copyright is preempted even if the particular expression is neither copyrighted nor copyrightable. *Baltimore Orioles, Inc.,* 805 F.2d at 676.

Wooten focuses her preemption argument on the second condition under Section 301(a); specifically, she contends that Plaintiffs' claim for breach of the Incentive Agreement rests

solely on Wooten's alleged copying and misappropriation of Act II's jewelry and designs. Section 106 provides copyright holders with five exclusive and fundamental rights: reproduction, adaption, publication, performance and display. *See,* 17 U.S.C. § 106; *Toney,* 406 F.3d at 909. To avoid preemption, "a state law must regulate conduct that is qualitatively distinguishable from that governed by federal copyright law — *i.e.,* conduct other than reproduction, adaptation, publication, performance, and display." *Id.* at 910; *Baltimore Orioles,* 805 F.2d at 676–77.

Generally, courts read preemption clauses to leave private contracts intact. *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1454 (7th Cir. 1996). As explained by the *ProCD* court:

> Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established *by law* — rights that restrict the options of persons who are strangers to the author. . . . A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."

*Id.* By entering into the Incentive Agreement, the parties entered into a private, contractual transaction concerning intellectual property. Moreover, Plaintiffs' allegations that Wooten breached the Incentive Agreement vary from allegations of copyright infringement in various ways, including that she: (1) failed to provide "best efforts" and substantially all of her time, attention and energy to Act II during its wind-up period;

- 16 -

(2) injured Act II's reputation; (3) engaged in acts of disloyalty; and (4) allowed her outside professional endeavors to interfere with the performance of her duties to Act II. A claim that Wooten breached her contractual duties under the Incentive Agreement is not equivalent to any of the exclusive rights copyright holders have under the Copyright Act. Thus, Plaintiffs' claim for breach of the Incentive Agreement is not preempted.

Wooten also argues that the restrictive covenants incorporated into the Incentive Agreement are unenforceable. First, Wooten contends that the restrictive covenants are unenforceable because Act II is out of business and therefore has no legitimate business interest to justify enforcement; this argument rings hollow. Wooten signed the Incentive Agreement and reaffirmed the covenants in October 2014, when she knew Act II had decided to cease its direct-sale operations at the end of that year; she cannot now come into Court and argue that the covenants she reaffirmed are unenforceable because Act II did, in fact, go out of business.

Next, Wooten argues that the restrictive covenants are overly broad and unenforceable. To be valid and enforceable, the terms of the covenant must be reasonable in geographic and temporal scope. *Prairie Rheumatology Assocs. v. Francis,* 24 N.E.3d 58, 62 (Ill. App. Ct. 2014). The reasonableness of a

restrictive covenant is determined "based on the totality of the facts and circumstances of the individual case." *Reliable Fire Equip. Co. v. Arredondo,* 965 N.E.2d 393, 403 (Ill. 2011). Unless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record. *See, e.g., Hafferkamp v. Llorca,* 2012 WL 6965102, at *5 (Ill. App. Ct. 2012).

Wooten is bound by two restrictive covenants contained in the Confidentiality Agreement, and reaffirmed in the Incentive Agreement: the Assignment Clause and the Confidentiality Clause. Under the Assignment Clause, "all inventions, improvements, discoveries, developments, concepts and ideas" relating to Act II's business or capable of beneficial use by Act II that Wooten developed during her employment became the sole property of Act II. This clause applied regardless of whether the development occurred on company time, and the clause extended for one year after Wooten's employment with Act II ended. Wooten also agreed in the Confidentiality Agreement that, during her employment and for 24 months thereafter, she would not divulge, nor use or permit the use of, any of Act II's Confidential Information. Confidential information is defined as information that is:

> [C]onfidential and proprietary in nature and is
> revealed and entrusted to Employee by Company in
> confidence . . . include[ing] but not limited to,
> Company's operations, methods of doing business, . . .

related marketing information, and any other proprietary or confidential business related information or date that may not rise to the level of a protected Trade Secret.

SAVC Ex. B ¶ 1(b)(1).

Neither covenant is patently unreasonable. Wooten is unable to cite a single case from this District invalidating an Assignment Clause like the one at issue here. Moreover, that covenant is limited in scope to developments relating to Act II's business or capable of beneficial use by Act II. While there may be some question as to the reasonableness of the *length* of this restriction, that question must be answered in light of the facts and circumstances surrounding Wooten's relationship with Act II. *Stephen & Hayes Constr., Inc. v. Meadowbrook Homes, Inc.,* 988 F.Supp. 1194, 1198–99 (N.D. Ill. 1998). Similarly, the Confidentiality Clause is limited in scope to information that "is revealed and entrusted to Employee in confidence." And while it is true that a valid confidentiality provision must contain geographic limitations (this one does not) that requirement does not extend to trade secrets, which is what this Confidentiality Clause appears to protect, at least in part. *See, Packaging v. Hein,* 2015 WL 6164957, at *6 (N.D. Ill. Oct. 20, 2015). Thus, to determine the enforceability of the Confidentiality Clause, the Court must determine whether the protected information constitutes trade secrets. After discovery, if either of these clauses proves to

be overbroad, they may be modified or found unenforceable at that time.

Finally, Wooten contends that Plaintiffs have failed to allege that Wooten violated the Incentive Agreement. Specifically, Wooten argues that (1) the Incentive Agreement superseded the Confidentiality Agreement; (2) the Incentive Agreement limited Wooten's obligations to the use of Act II's "intellectual property;" (3) intellectual property means copyright, trademark, or patent; and (4) Plaintiffs do not allege that Wooten violated their copyright, trademark, or patent rights. This argument inexplicably ignores Wooten's additional obligations under the Incentive Agreement.

Under the Incentive Agreement, Wooten was obligated to: devote her best efforts and substantially all her time to advance the interests of Act II; act loyally to, and in the best interest of, Act II; and not allow her outside professional efforts to interfere with the performance of her duties to Act II. Plaintiffs claim that, while employed by Act II, Wooten started AU with the goal of transitioning Act II's sales for to AU. In doing so, Wooten violated her obligations under the Incentive Agreement by: (1) telling her recruits they could start holding direct sales parties in January 2015; (2) manipulating Act II's settlements with its vendors; (3) marketing AU during January 2015 as a source for Lia Sophia

jewelry at 40% reduced prices; (4) holding AU meetings and work sessions while employed by Act II; and (5) concealing the extent of her outside professional efforts. These allegations are sufficient to state a claim for breach of the Incentive Agreement regardless of how the Court interprets Wooten's confidentiality obligations.

To understand Wooten's confidentiality argument, the Court must unpack the language of the Incentive Agreement. Under Section 2 of the agreement, Wooten could be terminated for cause if she breached "any term of the Confidentiality, Non-Disclosure and Developments Agreement between Employee and Act II dated July 25, 2011 (the "Restrictive Covenants") during the Term of this Agreement *except as outlined in Section 3 below*." *Id*. at ¶ 2(e)(ii) (emphasis added). Section 3, entitled "Reaffirmation of Covenants," states that "Employee acknowledges and reaffirms each of the covenants contained in the Restrictive Covenants." *Id*. ¶ 3. It then goes on to clarify that "[n]othing in this Agreement, the Restrictive Covenants, or the Prior Employment Agreements shall prevent Employee from continuing her work as a jewelry designer, as long as Employee does not infringe on any intellectual property belonging to" Act II. *Id*.

Wooten appears to suggest that by using the term "intellectual property" in the final sentence of Section 3, Act II waived its rights under the restrictive covenants unless the

asserted rights sound in copyright, trademark, or patent. Intellectual property is not defined in the contract; the Court declines to adopt the narrow definition proposed by Wooten because it does not align with the parties' intentions in other parts of the Incentive Agreement. Specifically, such a definition would render meaningless the first sentence of Section 3, in which the parties specifically reaffirmed the restrictive covenants. Under the restrictive covenants, Act II's protected rights were not limited to intellectual property, but rather included the categories of work product, proprietary information, and trade secrets. The Court chooses to read the Incentive Agreement in conjunction with the restrictive covenants it expressly reaffirms.

With this interpretation in mind, the Court turns to the allegations in the SAVC for breach of the Incentive Agreement based on Wooten's breach of the restrictive covenants. Plaintiffs allege that Wooten: (1) divulged/used confidential information and trade secrets; (2) failed and/or refused to return confidential information post-employment; and (3) wrongfully and openly claimed ownership in Act II product developments. Wooten argues that this claim cannot survive because the SAVC does not identify the confidential information, developments or trade secrets at issue. Plaintiffs specifically allege that Act II's jewelry design information, costing

information, vendor and supplier information, terms of the contract with such vendors and suppliers, collections developed for Act II, and sales potential for certain jewelry pieces all constituted trade secrets. The Court assumes this same information, if determined not to be trade secrets, is the confidential information Act II sought to protect through the restrictive covenants. This is sufficient at the motion to dismiss stage. *See, SKF USA, Inc. v. Bjerkness,* 636 F.Supp.2d 696, 711 (N.D. Ill. 2009) ("In Illinois, confidential information is 'particularized information disclosed to [the employee] during the time the employer-employee relationship existed which [is] unknown to others in the industry and which give[s] the employer advantage over his competitors.'" (internal citation omitted)).

### D. Count IV: Breach of Fiduciary Duty (Wooten)

Plaintiffs allege that Wooten, as the Vice President of Product Development, was a fiduciary of Act II, and that she breached her fiduciary duties by, among other things: (1) developing a business directly competitive to Act II while still employed by Act II; (2) using Act II's confidential information for her personal benefit and the benefit of AU; (3) failing to disclose the extent of her self-dealing and making misrepresentations to conceal her breaches of her fiduciary duties; (4) creating a misperception in the marketplace that AU

is connected to Act II; and (5) influencing Act II to return certain jewelry styles to vendors and then buying those pieces for AU. Wooten argues that this claim is preempted by both the Copyright Act and the ITSA.

As discussed previously, a claim is preempted by the federal Copyright Act if it seeks to protect rights that are equivalent to any of the rights established by a federal copyright. Similarly, the ITSA preempts all common law claims that are based on the misappropriation of a trade secret. 765 ILCS 1065/8(a) (stating that the "Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret"). The allegations in support of Plaintiffs' breach of fiduciary duty claim against Wooten do not equate to any of the rights established by a federal copyright. Nor do they amount to a claim of misappropriation of a trade secret. Rather, Plaintiffs state a claim for breach of fiduciary duty based on Wooten's actions in developing and operating a business that was directly competitive with Act II while she was still employed with Act II. Therefore, this claim is not preempted by either the Copyright Act or the ITSA.

Wooten also contends that Count IV fails to state a claim for breach of fiduciary duty because, under Illinois law, "employees may plan, form, and outfit a competing operation

while still working for the employer." *Delta Med. Sys. v. Mid-America Med. Sys., Inc.,* 772 N.E.2d 768, 785 (Ill. App. Ct. 2002). In citing this precedent, Wooten conveniently leaves out the caveat to this rule that an employee "may not commence competition" while still working for their employer. *Id.; see also, Dowell v. Bitner,* 652 N.E.2d 1372, 1379 (Ill. App. Ct. 1995) ("[F]ormer employees may compete with their former employers and solicit former customers provided there was no demonstrable business activity before termination of employment."). Taking the allegations in the SAVC as true, as the Court must at this stage, Wooten acted in a manner directly competitive with Act II while still in its employ. *See,* SAVC ¶ 149(f),(h).

Finally, although Act II acknowledged in the Incentive Agreement Wooten's desire to continue designing jewelry, Wooten also represented that her future endeavors would not conflict with her duties to Act II. This contractual provision in no way results in a waiver of Act II's claim for breach of fiduciary duty based on the alleged conduct. Count IV sufficiently states a claim for breach of fiduciary duty against Wooten.

### E. Count V: Tortious Interference with Contracts (AU)

In Count V, Plaintiffs raise a claim of tortious interference with contracts against AU. In response, AU contends that this claim is preempted by federal copyright law

and the ITSA.  The elements of a tortious interference with contract claim are:   (1) the existence of a valid and enforceable contract; (2) knowledge of that relationship on the part of the interferer; (3) an intentional interference inducing breach of contract; (4) a breach of contract caused by the interferer's acts; and (5) damages to the plaintiff.  *Higher Gear Grp., Inc. v. Rockenbach Chevrolet Sales, Inc.,* 223 F.Supp.2d 953, 959 (N.D. Ill. 2002).  As discussed previously, to prove preemption by the Copyright Act, AU must show that, through this claim, Plaintiffs are seeking to protect rights that are equivalent to any of the rights established by a federal copyright.

Plaintiffs claim that AU interfered with Wooten's employment contracts by marketing and selling jewelry using Act II's alleged designs and intellectual property.  Such a claim does not establish a fundamentally or qualitatively different element than a copyright infringement claim.  *See, Games Workshop Ltd. v. Chapterhouse Studios, LLC,* No. 10 C 8103, 2013 WL 1340559, at *11 (N.D. Ill. Apr. 1, 2013) ("[T]o avoid preemption, the state-law claim must incorporate an additional or different element such that the entire nature of the claim is qualitatively different from a copyright infringement claim.").  Rather, it merely adds an element of awareness and intentional interference on the part of AU.  Those additional elements do

not establish "qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated." *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983).

This action is equivalent in substance to a copyright infringement claim; the Court therefore concludes that the interference with contracts claim in Count V is preempted. *See, e.g., FASA Corp. v. Playmates Toys, Inc.*, 869 F.Supp. at 1359 (collecting eight cases for principle that "courts addressing" preemption of "state law claims for tortious interference with contract" generally conclude "that such claims are preempted"). To the extent that it is based on AU's misappropriation of trade secrets, the claim is also preempted by the ITSA. Count V is dismissed with prejudice.

### F. Count VI: Violation of ITSA (All Defendants)

In Count VI, Plaintiffs raise a claim against all Defendants for violation of the ITSA. Defendants contend, in passing, that this claim is preempted by the Copyright Act, but fail to explain how a claim for violation of the ISTA is equivalent to one of the rights comprised by a copyright. To establish an ITSA violation, Plaintiffs must show that: (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner. *Liebert Corp.*

*v. Mazur,* 827 N.E.2d 909, 925 (Ill. App. Ct. 2005); 765 ILCS 1065/2. Essentially, Defendants' preemption argument boils down to a contention that Plaintiffs have failed to plead the existence of a trade secret; if a trade secret has been alleged, then the ITSA claim is not preempted by the Copyright Act. Thus, Defendants' preemption argument is more properly viewed as an argument for failure to state a claim.

Under Section 2(d) of the ITSA, a trade secret is defined as follows:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). The key factor to establishing secrecy "is the ease with which the information can be readily duplicated without involving considerable time, effort or expense." *Stampede Tool Warehouse, Inc. v. May,* 651 N.E.2d 209, 215 (Ill. App. Ct. 1995). The existence of a trade secret is not obvious; "it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence

from each side." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 723 (7th Cir. 2003) (Internal citation and quotation omitted).

The SAVC is by no means a model of specificity, but it does meet the minimal Federal Rule of Civil Procedure 8(a) requirements. It alleges generally that Act II's "jewelry design information, costing information, vendor and supplier information, the terms of the contract with such vendors and suppliers, confidential collections, and the sales potential for certain jewelry pieces" were trade secrets. "Courts are in general agreement that trade secrets need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets." *Leucadia, Inc. v. Applied Extrusion Techs., Inc.,* 755 F.Supp. 635, 636 (D. Del. 1991). Moreover, the SAVC outlines many of the measures Act II employed to maintain the secrecy of this information including, limiting computer access and requiring confidentiality agreements. Thus, for withstanding a motion to dismiss, the SAVC suffices.

### G. Count VII: Civil Conspiracy (All Defendants)

Count VII alleges a claim of civil conspiracy against all of the Defendants. A conspiracy is an agreement by two or more people to commit an unlawful act or a lawful act by unlawful means. *Adcock v. Brakegate, Ltd.,* 645 N.E.2d 888, 894 (Ill.

App. Ct. 1994). A cause of action for civil conspiracy exists only if one of the parties to the agreement commits a tort in furtherance of the agreement. *Id.* Therefore, the tort is the "gist" of a civil conspiracy claim. *Id.* Plaintiffs' civil conspiracy claim against Defendants is premised on the allegations that Defendants: (1) "misappropriate[d] and use[d] for their own benefit [Act II's] jewelry designs, collections, and other proprietary work product"; (2) were improperly selling jewelry that was part of Act II's collection; (3) "misappropriated Act II's rights in its jewelry"; and (4) used Act II's intellectual property to compete unfairly. SAVC ¶¶ 170-74. The allegations supporting this claim are not qualitatively different from unauthorized use and distribution, which is the same conduct necessary to support a copyright infringement claim. Therefore, Plaintiffs' civil conspiracy claim is preempted by the federal Copyright Act. Moreover, if the Court viewed the claim as based on trade secret misappropriation, preemption under the ITSA would apply. As such, Count VII is dismissed with prejudice.

### H. Count VIII: Violation of ICFA (All Defendants)

In Count VIII, Plaintiffs claim Defendants falsely marketed AU as a source for Lia Sophia jewelry at deeply discounted prices, thereby creating a misperception in the marketplace of a

nexus between AU and Act II. Defendants contend that this claim
is also preempted by the Copyright Act and the ITSA.

Plaintiffs' ICFA claim and a copyright infringement claim
are based on the same conduct: the unauthorized use and
distribution of Act II's Lia Sophia jewelry. The fact that, in
this Count, Plaintiffs also accuse Defendants of selling the
jewelry under AU's name — and hence, implicitly misrepresenting
the origin of the jewelry or causing confusion in the
marketplace — does not qualitatively alter the nature of the
underlying infringement. *See, Goes Lithography Co. v. Banta
Corp.,* 26 F.Supp.2d 1042, 1048 (N.D. Ill. 1998). Every act of
copyright infringement by its nature involves some
misrepresentation as to the identity of the creator. *See,
Balsamo/Olson Group, Inc. v. Bradley Place Ltd. P'ship,* 950
F.Supp. 896, 898 (C.D. Ill. 1997). Accordingly, Plaintiffs'
ICFA claim is preempted by the Copyright Act. *Accord Chicago
Style Prods., Inc. v. Chicago Sun Times, Inc.,* 728 N.E.2d 1204,
1208 (Ill. App. Ct. 2000). In light of this conclusion, the
Court need not address Defendants' other arguments in favor of
dismissal. Count VIII is dismissed with prejudice.

### I. Count IX: Tortious Interference with Contract
### (Eckels, Mead and Daun)

In Count IX, Plaintiffs bring another claim of tortious
interference with contract, this time against Defendants Eckels,
Mead and Daun. Plaintiffs allege that Eckels, Mead and Daun

interfered with Wooten's employment contracts by working with Wooten to market and sell jewelry using Act II's designs. This claim, like the tortious interference claim alleged in Count V against AU, is equivalent in substance to a copyright infringement claim, and is therefore preempted by the Copyright Act. To the extent this claim is based on Eckels, Mead and Daun's misappropriation of trade secrets, it is also preempted by the ITSA. *Higher Gear Grp., Inc.,* 223 F.Supp.2d at 960. Count IX is dismissed with prejudice.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Defendants Wooten and AU's Motion to Dismiss [ECF No. 48], and Defendants Mead, Eckels and Daun's Motion to Dismiss [ECF No. 51] are granted in part and denied in part.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: July 11, 2016