IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ACT II JEWELRY, LLC, a
Delaware Limited Liability
Corporation d/b/a Lia
Sophia; and KIAM EQUITIES
CORPORATION, a Delaware
Corporation,

        Plaintiffs,

    v.

ELIZABETH ANN WOOTEN;
ADORNABLE-U, LLC, a Delaware
Limited Liability Company;
NICOLE MEAD; SHANNON ECKELS;
and BECKA DAUN,

        Defendants.

Case No. 15 C 6950

Judge Harry D. Leinenweber

ELIZABETH ANN WOOTEN;
ADORNABLE-U, LLC, a Delaware
Limited Liability Company;
NICOLE MEAD; and SHANNON
ECKELS,

    Counterplaintiffs/
    Third-Party Plaintiffs,

    v.

ACT II JEWELRY, LLC, a
Delaware Limited Liability
Company; and KIAM EQUITIES
CORP., a Delaware
Corporation; VICTOR K.
KIAM III; and ELANA KIAM,

    Counterdefendants/
    Third-Party Defendants.

**MEMORANDUM OPINION AND ORDER**

Presently before the Court are Counterplaintiffs/Third-Party Plaintiffs ("CP/TPPs") Wooten and Adornable-U's Motion for Expedited Declaratory Judgment Hearing and Preliminary Injunction [ECF No. 55], and Counterdefendants/Third-Party Defendants ("CD/TPDs") Act II Jewelry ("Act II"), Kiam Equity Corporation ("KEC"), and Victor and Elana Kiam's ("the Kiams") Motion to Dismiss the Counterclaim and Third-Party Complaint [ECF No. 64]. For the reasons stated herein, the Motion to Dismiss is granted in part and denied in part. The Motion for Expedited Declaratory Judgment Hearing and Preliminary Injunction is denied.

## I.  BACKGROUND

Prior to the end of 2014, Act II (formerly d/b/a "Lia Sophia") — a direct-sales jewelry company owned and controlled by the Kiams — sold jewelry through a network of independent contract sales representatives ("Sales Advisors"). Act II sold "open line" costume jewelry, which was designed and manufactured in China and offered for sale to anyone around the world. Counterplaintiff Elizabeth Wooten ("Wooten") was Vice President of Merchandising for Act II from July 2011 until February 2015.

Act II began plans to shut down its business in early 2014. In June 2014, KEC, another entity owned by the Kiams, hired Mackinac Partners LLC ("Mackinac") to oversee operations and

help wind down and liquidate Act II.  Mackinac brought in Keith Maib ("Maib") and Matt Beresh ("Beresh") to assist in the process.  Despite actively working to close the business, Act II chose not to inform its Sales Advisors of this decision. Instead, the Kiams requested that Wooten prepare a Spring/Summer 2015 collection so the Sales Advisors would think Act II was planning to stay in business. Act II never intended to, and never did, advertise or sell the collection.  Wooten — who was instructed not to spend any money on development — created the collection by selecting images of open line, pre-designed items from Chinese mass-manufacturers and copying images from the internet.  With limited exceptions not relevant here, none of the jewelry or images featured in the Spring/Summer 2015 collection incorporated any Act II or Lia Sophia designs.

In September 2014, Wooten disclosed to Maib and Beresh that, in light of the fact that Act II was going out of business, she wished to start her own company, Adornable-U ("AU"), and enter into the direct-sales jewelry business. Wooten spoke with Beresh and Maib regarding her plans several times over the course of the next two months.  They told her that the Kiams had no objection to Wooten starting her own direct-sales jewelry company and working with former Act II Sales Advisors.  Maib instructed Wooten to avoid using the Kiams

intellectual property, including the name Lia Sophia and Act II's taglines.

On December 1, 2014, Act II announced publically that it was winding down the Lia Sophia business by the end of that year, and ceasing all operations by the end of February 2015. Wooten received a letter stating that her employment was being terminated as of January 30, 2015; she was asked to stay on until then to help with the wind-up and liquidation of the company's assets. To reflect this agreement, Wooten and Act II entered into the Incentive Agreement, which entitled Wooten to a severance payment of $131,250 due on the Incentive Agreement's "Termination Date." The severance payment replaced any severance Wooten would have been entitled to under her previous employment agreements. The Agreement also entitled Wooten to an Incentive Bonus based on a series of factors related to inventory sales. The Incentive Bonus was due within 30 days of the Termination Date. Pursuant to the terms of the Agreement, Wooten earned an Incentive Bonus of $480,000. Counterclaim and Third-Party Complaint ("CTPC") Ex. A ¶ 2(a), ECF No. 54. In order to qualify for the benefits outlined in the Agreement, Wooten could not be terminated for cause. KEC signed the Incentive Agreement as guarantor. *Id.*

Wooten told the Kiams of her plans to open AU during a meeting on December 16, 2014. Specifically, she told them that

AU would sell the same type of products sold by Act II, and that she planned to offer the Act II Sales Advisors positions with her company. The Kiams made it clear that they and Act II had no interest in continuing in the direct-sales jewelry business and had no objections to Wooten's plans.

Throughout December, Act II returned most of its inventory of product samples to vendors, including the samples used for the 2015 Spring/Summer collection. By December 31, 2014, Act II had ceased all of its direct-selling business and terminated all of its Sales Advisors. In January and February 2015, Act II wound up its affairs, transferred all of its inventory and most of its other assets to a creditor pursuant to an asset foreclosure, and sold most of its office, warehouse, and distribution center furniture, fixtures and equipment to another entity to be auctioned off.

On January 12, 2015, Act II sent Wooten another letter reiterating her termination date of January 30, 2015. The next day, Wooten spoke with the Kiams again about AU and told them she planned to open and start shipping products to customers in February 2015. The Kiams told her that they did not have a problem with her plans as long as she continued to help with the Act II liquidation. On January 20, at a meeting of Act II executives, Wooten announced that she was going to open AU. Maib told the assembled executives that he and the Kiams

supported Wooten's endeavor and that Wooten had been upfront with the Kiams about her intentions. That same day, AU posted its first catalog on its Facebook page; the "Look Book" allowed customers to see what AU planned to offer as its initial line of products, but the products were not yet available for purchase. Wooten emailed the Kiams and let them know she had made the announcement and posted the Look Book online.

A few days later, Beresh told Wooten that the Kiams were concerned about certain items contained in the Look Book. Then, on January 23, 2015, the Kiams issued the following public statement:

> We understand that there has been some confusion surrounding the launch of a new direct-selling company, adornable.u.
>
> Following the December 1st announcement regarding the wind down of Lia Sophia, Ann Wooten, our Vice President of Merchandising, approached us with the idea of starting her own direct-selling company. Many of you know Ann, and we were supportive of this next chapter of her career and her aim to continue empowering women through direct selling.

The Kiams went on to state that they had reviewed the AU Look Book and that "there are some questions regarding some of the styles being offered. As a result, Ann has removed certain items presented in [AU]'s catalog while we work through these issues." Privately, the Kiams asked Wooten to remove 52 jewelry styles that they claimed were based on designs that belonged to Act II. Although Wooten contests whether Act II has proprietary rights to the 52 designs, she agreed not to sell the styles

while the parties discussed an overall resolution to the dispute.

On January 29, 2015, CD/TPDs' counsel demanded that AU "cease and desist" any efforts to sell 98 styles of jewelry, which they claimed were based on Lia Sophia designs. The 98 styles include the 52 items discussed above, plus an additional 46 items that CD/TPDs claimed were the same or similar to products in the Lia Sophia Spring/Summer 2015 collection. The letter threatened to terminate Wooten for cause because, CD/TPDs asserted, she was committing copyright infringement and violating intellectual property laws by offering to sell the designs in question.

In response, Wooten and AU requested information to substantiate the claim that the 98 jewelry pieces were protected by copyright or other intellectual property rights. CD/TPDs refused to comply with this request. Instead, CD/TPDs demanded: (1) a detailed accounting of AU's jewelry inventory; (2) removal of all 98 pieces of jewelry from AU's online catalog; (3) disclosure of all AU print catalogs and information regarding how many were printed, where they were kept, and who prepared them; (4) a complete list of AU distributors; and (5) disclosure of all scheduled AU parties and copies of all promotional materials sent in connection with those parties. On February 5, 2015, Wooten and AU made a settlement offer but CD/TPDs

responded that they were not interested in negotiating and expected full compliance with their demands by Monday, February 9, 2015.

On February 9, CD/TPDs' attorneys sent a letter terminating Wooten for cause. The letter asserted that Wooten's "refusal to comply with my clients' demands to cease and desist, constitute willful misconduct," and that Wooten was "using Lia Sophia's proprietary information and work product to compete against the company." Wooten and AU again attempted to negotiate a settlement with CD/TPDs, to no avail. AU's operations remained suspended until negotiations fell apart on March 6, 2015.

On March 20, 2015, Act II/KEC filed its initial Complaint in this case in the Circuit Court of Cook County, Illinois. The court ordered the Complaint be sealed. Yet, on March 27, 2015, CD/TPDs, through their attorneys, sent a copy of the Complaint by email to hundreds of AU's Sales Advisors and other former Act II Advisors. The attached letter stated that Wooten had breached her legal obligations by using "Lia Sophia's jewelry designs and other proprietary developments and intellectual property without the company's permission." It went on to warn the recipients that, although they were not currently named as defendants in the litigation, the complaint could be amended as necessary. After receiving this letter, hundreds of AU Sales Advisors and potential Sales Advisors refrained from doing

business with AU, and the company's sales dropped nearly 50 percent.

In April 2015, CD/TPDs issued 23 third-party subpoenas to AU's current, former and potential Sales Advisors and other third parties. Twenty-one of the subpoenas called for depositions. Then, on May 7, 2015, CD/TPDs' counsel sent another letter to actual and potential AU Sales Advisors. This letter reiterated the allegations against Wooten and AU and stated that Wooten and AU had "recently admitted in court papers that, contrary to our prior understanding, these pieces are now being actively marketed by [AU] and its independent contractor sales force." The letter warned the Sales Advisors that "by selling the items in question, you may be acting unlawfully."

On July 17, 2015, Act II/KEC filed a Second Amended Complaint in the state court naming three individual AU Sales Advisors — Eckels, Mead and Daun — as additional defendants. Within days, CD/TPDs' counsel sent a copy of the Second Amended Complaint along with another letter to a group of actual and potential AU Sales Advisors. In the letter, counsel stated that Eckels, Mead and Daun had "been sued because they continued to sell the styles, even after they were advised that [Wooten's] contractual and other legal obligations prohibited her (and them) from doing so." Again, the letter threated its recipients with subpoenas and possible legal liability.

Eckels, Mead and Daun removed the case to this Court in August 2015. CP/TPPs immediately filed a motion for protective order and to stay discovery pending disposition of their motion to dismiss the Second Amended Complaint. On August 19, the Court entered an order staying discovery and entering and continuing the motion for protective order to September 22, 2015. Despite the pendency of this motion, on August 31, 2015, CD/TPDs' attorneys sent another mass mailing to AU Sales Advisors warning them of the possibility of being sued for their involvement in AU. Then, in early October 2015, CD/TPDs acted on these threats and launched a series of lawsuits in state courts across the country against individual AU Sales Advisors. To date, CP/TPPs have learned of four such suits filed in four different states.

## II.  MOTION TO DISMISS COUNTERCLAIM AND THIRD-PARTY COMPLAINT

### A.  Count I:  Declaratory Judgment
### (All CP/TPPs Against All CD/TPDs)

CD/TPDs argue that CP/TPPs' declaratory judgment claim is duplicative of the claims in the Second Amended Complaint and should therefore be dismissed. The purposes of a declaratory judgment is to "clarify[] and settl[e] the legal relations at issue" and to "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Borchard, *Declaratory Judgments* 299 (2d ed. 1941). A declaratory judgment is available where a party desires a

declaration of the legal effect of a proposed or past course of action. The Declaratory Judgment Act contemplates two "related but distinct fact situations" in which declaratory relief should be made available:

> (1) The controversy has ripened to a point where one of the parties could invoke a corrective remedy (*i.e.*, a suit for damages or an injunction) but has not done so; and
> (2) Although the controversy is real and immediate, it has not ripened to such a point, and it would be unfair or inefficient to require the parties to wait for a decision.

*Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 749 (7th Cir. 1987).

The present suit does not fit either situation. CP/TPPs have already engaged in the alleged conduct, and continue to do so. CD/TPDs' right to a coercive remedy, if any, has accrued. "In such circumstances, a federal court may grant a declaratory judgment to prevent one party from continually accusing the other, to his detriment, without allowing the other to secure an adjudication of his rights by bringing suit." *Id.* However, CD/TPDs have not engaged in such conduct. They have filed suit to enforce their claim that CP/TPPs are violating their intellectual property and contractual rights. Thus, CP/TPPs' declaratory judgment claim will not serve a useful purpose; it is therefore dismissed with prejudice. *Int'l Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1218 (7th Cir. 1980) ("[T]he pending suit may make resolution of the issues presented by this

declaratory judgment suit unnecessary. This is an appropriate basis on which to decline to exercise our discretionary jurisdiction.").

### B. Count II: Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (All CP/TPPs Against All CD/TPDs)

CP/TPPs claim that by disseminating false and misleading statements about AU, CD/TPDs have engaged in unfair and deceptive acts and practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"). The statements in question were made by CD/TPDs' counsel through mass mailings to AU's current and potential Sales Advisors. CD/TPDs argue that this count must be dismissed because litigation activity cannot be the basis for an ICFA claim.

In *Cripe v. Leiter,* 703 N.E.2d 100 (Ill. 1998), the Supreme Court of Illinois held that because "the attorney-client relationship . . . is already subject to extensive regulation by [the state supreme court]," the ICFA does not "apply to the conduct of attorneys in relation to their clients." *Id.* at 106. This principle has been extended beyond suits by clients against their attorneys to claims against someone else's attorney. *See, Kosydor v. Am. Exp. Centurion Servs. Corp.,* 979 N.E.2d 123, 132 (Ill. App. Ct. 2012); *Wilbourn v. Advantage Fin. Partners, LLC,* 2010 WL 1194950, at *12 (N.D. Ill. Mar. 22, 2010). CD/TPDs seek

to extend this precedent a step further, to bar ICFA claims against a client based on the actions of their attorney.

*Cripe* and its progeny reason that the legislature did not intend to further regulate the practice of law through the ICFA because the profession is already subject to extensive regulation. The Illinois Supreme Court administers a comprehensive regulatory scheme governing attorney conduct, including setting forth the Illinois Rules of Professional Conduct ("ILRPC") and establishing discipline for attorneys who violate those rules. *Cripes,* 703 N.E.2d at 105. Attorneys are forbidden "from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.,* citing ILRPC 8.4. Moreover, the Rules reach beyond the attorney-client relationship itself to regulate the conduct of attorneys with non-clients and potential or actual adversaries. Thus, because an attorney is already subject to discipline for his or her actions in the practice of law, it makes sense that he or she should not also be subject to liability under the ICFA.

But this rationale does not support the extension urged by CD/TPDs to bar ICFA claims against a client based on the actions of their attorney. Because the attorney is an agent of the client, actions the attorney takes on the client's behalf are imputed to the client. But, unlike their attorney, the client is not subject to disciple under the ILRPC for those actions.

It follows that the attorney's immunity from suit under the ICFA should not extend to the client. *Grant-Hall v. Cavalry Portfolio Servs., LLC,* 856 F.Supp.2d 929, 943 (N.D. Ill. 2012).

CD/TPDs also argue that the statements in question were neither deceptive nor misleading and therefore do not support a claim under the ICFA. This argument directly conflicts with the allegations in the Counterclaim and Third-Party Complaint in which CP/TPPs claim that the statements were false. Moreover, the truth or falsity of these statements is the ultimate question of this case; it is not a determination that can be made on a motion to dismiss.

### C. Count III-V: Defamation Per Se, False Light (Wooten and AU, Eckels and Mead Against All CD/TPDs)

CD/TPDs argue that the defamation and false light claims in Counts III through V must be dismissed because the statements upon which these claims are premised are protected by the absolute litigation privilege. "A party to private litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." Restatement (Second) of Torts § 587 (1977); *see also, Johnson v. Johnson & Bell, Ltd.,* 7 N.E.3d 52, 56 (Ill. App. Ct. 2014). This privilege is not dependent on the motives

of the party or the party's knowledge of the accuracy of a statement. *Johnson,* 7 N.E.3d at 56. The sole requirement is that the communication is pertinent to the litigation. Pertinency is a broad umbrella, and the privilege will attach even where the defamatory statement is beyond the contested issues of the litigation. *Atkinson v. Affronti,* 861 N.E.2d 251, 256 (Ill. App. Ct. 2006). In essence, the privilege affords immunity to attorneys and other participants in the judicial process from tort liability arising out of statements made in connection with litigation. *Steffes v. Stepan Co.,* 144 F.3d 1070, 1074 (7th Cir. 1998).

In Illinois, the "rules on absolute privileges to publish defamatory matter stated in §§ 583 to 592A apply to the publication of any matter that is an invasion of privacy." Restatement (Second) of Torts § 652F (1977); *McGrew v. Heinold Commodities, Inc.,* 497 N.E.2d 424, 432 (Ill. App. Ct. 1986) ("[T]he rules on absolute privilege in defamation actions apply to invasion of privacy suits as well."). False light is considered an invasion of privacy tort. Restatement (Second) of Torts § 652E (1977); *Zdeb v. Baxter Int'l, Inc.,* 697 N.E.2d 425, 430 (Ill. App. Ct. 1998) (observing that false light is recognized as an invasion of privacy cause of action).

Counts III, IV and V raise defamation and false light claims based on statements made in the letters sent by CD/TPDs'

counsel regarding the allegations and issues in this case, and assertions made in the Second Amended Complaint. These statements were made in connection with the current judicial proceedings; the privilege arising from them is absolute. The grounds for this privilege appear on the face of the complaint, and can be considered in a motion to dismiss for failure to state a claim. *McGrew,* 497 N.E.2d at 432. Therefore dismissal with prejudice of Counts III, IV and V is appropriate under the absolute litigation privilege.

### D. Counts VI-IX: Tortious Interference with Contract & Tortious Interference with Prospective Economic Advantage (AU, Eckels and Mead Against All CD/TPDs)

In Counts VI through IX, AU and Eckels and Mead claim that CD/TPDs tortuously interfered with their contractual and prospective business relationships by: (i) asserting that AU and its Sales Advisors are prohibited from selling the 98 pieces of jewelry at issue; (ii) asserting that AU's products are based on Act II's designs or intellectual property, or are otherwise Act II's property; (iii) sending the Initial Complaint, Second Amended Complaint, and numerous letters to hundreds of AU Sales Advisors; (iv) serving unnecessary and overly-broad subpoenas for documents and depositions on more than twenty current and potential AU Sales Advisors; and (v) filing unsubstantiated sham lawsuits against at least seven current AU Sales Advisors. The Court first notes that, under Illinois law, a tortious

interference claim may not be based on the wrongful filing of a lawsuit. *Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 647 (7th Cir. 1983). Thus, the Court limits its analysis to the complaints, letters, and subpoenas.

CD/TPDs argue that, like the defamation and false light claims, dismissal of the tortious interference claims is warranted due to application of the absolute litigation privilege. In Illinois, the absolute litigation privilege is limited in scope to defamation and invasion of privacy actions. *Cond. Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 708 (N.D. Ill. 2006); *see also, Zdeb,* 697 N.E.2d at 430 ("Illinois courts have not extended the section 586 privilege to claims for intentional interference with prospective economic advantage. . . ."). The Court declines to extend the absolute litigation privilege to bar the tortious interference claims in question.

Next, CD/TPDs argue that these claims are subject to a qualified privilege. Illinois has adopted the approach taken by the Restatement (Second) of Torts for determining whether a qualified privilege exists. *Kuwik v. Starmark Star Mktg. & Admin., Inc.,* 619 N.E.2d 129, 134 (Ill. 1993). Under this approach, a court looks to the occasion "for the communication and determines as a matter of law and general policy whether the occasion created some recognized duty or interest to make the

communication so as to make it privileged." *Id.* This approach points to three classes of communications that are conditionally privileged, those involving: (1) some interest of the person who published the defamatory matter; (2) some interest of the person to whom the matter is published or a third party; and (3) a recognized public interest. *See,* Restatement (Second) of Torts §§ 594, 595 (1977). Once a qualified privilege is established, the plaintiff must demonstrate that the defendant abused the privilege by providing evidence that the defendant displayed a "reckless disregard" as to whether the statement was false. *DePinto v. Sherwin-Williams Co.,* 776 F.Supp.2d 796, 804 (N.D. Ill. 2011); *Vickers v. Abbott Labs.,* 719 N.E.2d 1101, 1110 (Ill. App. Ct. 1999).

The communications at issue here consisted of copies of the complaint and amended complaint, cease and desist/litigation hold letters, and subpoenas. These communications fit in two of the classes of communications that are subject to a qualified privilege. First, CD/TPDs made the communications to protect their contractual rights and intellectual property rights and interests, which they believed were being violated. CD/TPDs sought to prevent the continued sale of the disputed jewelry designs, and the letters and subpoenas were an attempt to preserve any evidence they may need to pursue their rights in court. Second, the communications advised the current and

potential AU Sales Advisors of their duties and potential liabilities in light of the allegations against CP/TPPs. Therefore, under the facts alleged, the Court concludes that the communications are subject to a qualified privilege.

Because a qualified privilege attaches to the communications in question, CD/TPDs are immune from tort liability based on these statements unless they are found to have abused this privilege. Generally abuse of privilege is a question of fact for the jury unless determination of the issue is clear from the face of the pleadings and attached exhibits. *Turner v. Fletcher,* 706 N.E.2d 514, 518 (Ill. App. Ct. 1999). In the Counterclaim and Third-Party Complaint, CP/TPPs claim that (i) the statements in the letters and the complaint were false and misleading; (ii) CD/TPDs knew the statements were false; (iii) CD/TPDs intended to harm CP/TPPs and drive AU out of business; (iv) CD/TPDs acted with reckless disregard, or actual malice and willful, wanton and intentional disregard for CP/TPPs rights; and (v) the false and misleading communications were disseminated to hundreds of recipients, including many who did not even work for AU. These allegations (taken as true at this stage) are sufficient to state a claim that CD/TPDs abused the qualified privilege.

CD/TPDs' other arguments in favor of dismissal of the tortious interference claims are not appropriate in a Rule

12(b)(6) motion to dismiss as they all go to the heart of the matter — whether the statements, and the manner in which they were made, constitute intentional and unjustified inducement of a breach of contract or interference with a business expectancy. In their allegations, CP/TPPs claim that the letters and subpoenas contained false information, that CD/TPDs knew the information was false, and that they used the letters and subpoenas to intimidate AU's current and prospective Sales Advisors in order to dissuade them from working with AU and drive the company out of business. This is sufficient. The Court need not address the merits of the claim at this stage; the Motion to Dismiss Counts VI-IX is denied.

### E. Count X: Illinois Wage Payment and Collection Act (Wooten Against All CD/TPDs)

In Count X, Wooten brings a claim against CD/TPDs under the Illinois Wage Payment Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq.* Wooten claims CD/TPDs violated Section 5 of the IWPCA, which provides that "[e]very employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5. KEC argues that because it was not Wooten's employer, it is not liable to Wooten under the Act.

The IWCPA defines the term "employer" in two different places. Section 2 states that, "[a]s used in [the IWCPA], the

term 'employer' shall include any individual, partnership, association, corporation, business trust . . . , or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed." 820 ILCS 115/2. Section 13, in turn, states that "any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13. The first part of Section 2 defines who is considered an employer under the Act; the second part of Section 2 confirms that an employer may be held liable "both for its own violations of the Wage Act and for any Wage Act violations committed by its agents." *Andrews v. Kowa Printing Corp.,* 838 N.E.2d 894, 899 (Ill. 2005). Section 13 also "imposes personal liability on any officers *or agents* [of the employer] who knowingly permitted the Wage Act violation." *Id.* (emphasis added).

There is no question that Wooten was employed by Act II. The question here is whether KEC qualifies as an agent of Act II for purposes of liability under the IWCPA. This question turns on whether, at any point during Wooten's employment relationship with Act II, KEC acted "directly or indirectly in the interest of" Act II "in relation to" Wooten. 820 ILCS 115/2. Wooten has alleged that: (1) both Act II and KEC are owned and controlled

by the Kiams; (2) KEC was involved in the wind up and liquidation of Act II while Wooten was still employed by the company; and (3) Act II, KEC and the Kiams used the existence of AU as a pretext to fire Wooten for cause and as an excuse to withhold payments to which she was entitled. Whether these allegations make KEC an agent of Act II for purposes of liability under the IWCPA is a factual question that cannot be resolved on a motion to dismiss. Therefore, the Court declines to dismiss Count X as to KEC.

## F. Count XI: Breach of Contract
### (Wooten Against Act II and KEC)

KEC contends that it is not a proper party to Count XI because it is only a guarantor to the Incentive Agreement and therefore is not liable to Wooten unless and until Act II fails to pay Wooten pursuant to the agreement. Wooten responds that KEC is a proper party to her breach of contract claim because it signed the Incentive Agreement as unconditional guarantor of the payments.

The guaranty in the incentive agreement provides that "payment of the Incentive Bonus, the Severance Payment and the payments under the Executive Deferred Compensation Plan under the terms of the foregoing [Incentive Agreement] between Act II Jewelry, LLC and Ann Wooten, to the extent otherwise payable, are hereby guaranteed by [KEC]." This is an unconditional, or absolute, guaranty because it is an unconditional undertaking on

the part of KEC that, to the extent Wooten is owed compensation under any of the aforementioned agreements, it will guarantee payment. *See, Lawndale Steel Co. v. Appel,* 423 N.E.2d 957, 960 (Ill. App. Ct. 1981). Liability under an absolute guaranty, unlike a conditional one, is triggered "by a default of the debtor on the obligation the debtor owes to the creditor." *Int'l Supply Co. v. Campbell,* 907 N.E.2d 478, 485 (Ill. App. Ct. 2009). In other words, an absolute guarantor is liable immediately upon default of the principal. When a guaranty is absolute, the lender may choose to demand payment from either the debtor or the guarantor upon the debtor's default. *Ochs v. Hindman,* 984 F.Supp.2d 903, 911 (N.D. Ill. 2013). Because KEC signed the Incentive Agreement as an absolute guarantor, it is a proper party to Wooten's breach of contract claim in Count XI.

### III. <u>MOTION FOR EXPEDITED DECLARATORY JUDGMENT HEARING AND PRELIMINARY INJUNCTION</u>

Because CP/TPPs' declaratory judgment claim is dismissed, the Motion for Expedited Declaratory Judgment Hearing is denied as moot. CP/TPPs also seek a preliminary injunction: (i) barring the Kiams and their attorneys from contacting, intimidating or threatening AU's Sales Advisors; (ii) barring the Kiams from filing additional suits against AU's Sales Advisors; and (iii) staying the four existing state court actions pending resolution in this Court of the core issue of whether CD/TPDs have any right to prevent the sale of the

jewelry products at issue. As an initial matter, the Court notes that the existing state court actions have already been stayed by the respective state courts pending the resolution of this case. In light of this, the Court believes it would be unnecessary, and a misuse of its authority, to grant CP/TPPs' requested injunction as to those cases. The injunction as to the existing state court cases is denied.

As to CP/TPPs' request for an injunction barring CD/TPDs from instituting any additional state court actions against other AU Sales Advisors, CD/TPDs argue that this is prohibited by the federal Anti-Injunction Act, 28 U.S.C. § 2283. But the Anti-Injunction Act does not preclude injunctions against the *institution* of state-court proceedings, only stays of pending state proceedings. *Dombrowski v. Pfister,* 380 U.S. 479, 484 n. 2 (1965) (Anti-Injunction Act applies only to state proceedings actually begun at the time the injunction is issued); *Boyle v. Landry,* 422 F.2d 631, 634 (7th Cir. 1970) (same). That said, the Court believes there is no basis for entering the requested injunction as to future state court actions. Since this case was initiated in March 2015, CD/TPDs have only instituted suits against four of AU's Sales Advisors. The actions that have been filed are not duplicative of this suit. Nor is there any indication that, in filing these actions, CD/TPDs are being vexatious or engaging in forum

shopping. Moreover, as the existing state cases have demonstrated, the state courts are entirely capable of ordering a stay of any new litigation pending the outcome of this suit. Therefore, CP/TPPs' requested injunction as to any additional state court actions against other AU Sales Advisors is denied.

The Court considers CP/TPPs' final requested injunction — barring the Kiams and their attorneys from contacting, intimidating or threatening AU's Sales Advisors — to be unwarranted and overly prejudicial. CP/TPPs' allegations that CD/TPDs have overstepped their bounds in their communications with AU Sales Advisors is unsubstantiated. Granting the requested injunction would require a determination on an ultimate issue in the case without a fully developed record — something the Court is unwilling to do. Further, the requested injunction would constrain CD/TPDs ability to develop the record, as it would effectively prevent them from investigating many of their claims. Of course, any contact CD/TPDs have with the AU Sales Advisors going forward may be used as evidence to support CP/TPPs' tortious interference claims. But the Court is unwilling to limit the parties' rights to pursue discovery at this time. Therefore, the requested relief is denied.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, CD/TPDs' Motion to Dismiss the Counterclaim and Third-Party Complaint [ECF No. 64] is

granted in part and denied in part.  Counts I, III, IV and V are dismissed with prejudice.  CP/TPPs' Motion for Expedited Declaratory Judgment Hearing and Preliminary Injunction [ECF No. 55] is denied.

**IT IS SO ORDERED.**


_____
Harry D. Leinenweber, Judge
United States District Court

Dated: July 27, 2016