IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ACT II JEWELRY, LLC, a
Delaware Limited Liability
Corporation d/b/a Lia
Sophia; and KIAM EQUITIES
CORPORATION, a Delaware
Corporation,

                Plaintiffs,

     v.

ELIZABETH ANN WOOTEN;
ADORNABLE-U, LLC, a Delaware
Limited Liability Company;
NICOLE MEAD; SHANNON ECKELS;
and BECKA DAUN,

                Defendants.

─────────────────────

ELIZABETH ANN WOOTEN;
ADORNABLE-U, LLC, a Delaware
Limited Liability Company;
NICOLE MEAD; and SHANNON
ECKELS,

     Counterplaintiffs/
     Third-Party Plaintiffs,

       v.

ACT II JEWELRY, LLC, a
Delaware Limited Liability
Company; and KIAM EQUITIES
CORP., a Delaware
Corporation; VICTOR K.
KIAM III; and ELANA KIAM,

     Counterdefendants/
     Third-Party Defendants.

Case No. 15 C 6950

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Cross-Motions for Partial Summary Judgment. Plaintiffs Act II Jewelry, LLC, Kiam Equities Corp. ("KEC"), F-Five LLC, Victor K. Kiam, III, and Elena Kiam (collectively, "Act II") move for summary judgment on the breach of fiduciary duty claim and all remaining counterclaims. Defendants Elizabeth Ann Wooten, Adorable-U, LLC, Nicole Mead, Shannon Eckels, and Becka Daun (collectively, "Adorable-U" or "Defendants") move for summary judgment on Act II's trade secret and breach of contract claims. For the reasons stated herein, Act II's Motion for Summary Judgment and Adorable-U's Motion for Summary Judgment are granted in part and denied in part. Act II's Motion for Summary Judgment is granted as to the tortious interference claims and the Illinois Consumer Fraud claim, but denied as to the breach of fiduciary duty claim, breach of Incentive Agreement claim and the Illinois Wage Payment and Collection Act claim. Defendants' Motion for Summary Judgment on Act II's trade secret claims against Mead, Eckels, and Daun is granted. The rest of Defendants' Motion is denied.

## I.  BACKGROUND

The Court assumes familiarity with the underlying facts of this case as recited in its previous opinions [ECF Nos. 90,

95, 252]. *See, generally, Act II Jewelry, LLC v. Wooten,* 301 F.Supp.3d 905 (N.D. Ill. 2018) (motion to dismiss and partial summary judgment); *Act II Jewelry, LLC v. Wooten,* No. 15 C 6950, 2016 WL 4011233 (N.D. Ill. July 27, 2016) (motion to dismiss counterclaims); *Act II Jewelry, LLC v. Wooten,* No. 15 C 6950, 2016 WL 3671451 (N.D. Ill. July 11, 2016) (motion to dismiss operative complaint). The Court reiterates the basic facts and will discuss in more detail in the analysis as necessary.

Plaintiff Act II Jewelry, LLC was in the jewelry sales industry. (Defs.' Resp. to Pls.' Facts, Dkt. No. 307, ¶ 4.) It marketed and sold jewelry by having a network of sales representatives hold parties in customers' homes, commonly known as the "party plan" business model. (*Id.*) Ann Wooten was employed as Vice President of Product Development by Act II for approximately three and a half years from July 2011 to February 9, 2015. (*Id.*) As Vice President of Product Development, Wooten, and her team, selected, developed, and designed Act II's line of jewelry. (*Id.* ¶ 5.)

On December 1, 2014, Act II announced it would be winding down its direct-selling, party plan jewelry business in the United States and Canada and its sales advisors would be selling its Fall/Winter 2014 collection at discounted prices

through December 31, 2014. (*Id.* ¶ 8.)  To ensure an orderly wind down process, Act II entered into a Key Employee Incentive Bonus Agreement (the "Incentive Agreement") with several employees, including Wooten.

The Incentive Agreement provided financial incentives for Wooten to remain employed with Act II and work diligently during the wind down period. (Dkt. No. 307, ¶ 8.)  The Incentive Agreement included a reaffirmation of a previously agreed to Non-Disclosure Agreement stating that all trade secrets Wooten obtained during her employment were to be held in confidence solely in connection with and for the purposes of employment with Act II. (*Id.* ¶ 7.)  The Incentive Agreement also specifically allowed Wooten to continue working in the jewelry field, stating that nothing in the agreement would prevent Wooten from "continuing her work as a jewelry designer, as long as [Wooten] does not infringe on any intellectual property belonging to the Company." (*Id.* ¶ 10.) Finally, the Incentive Agreement entitled Wooten to severance and bonus pay if she acted in accordance with the agreement so long as she was not terminated for cause. (*Id.* ¶ 11.)

Act II terminated its normal business at the end of December 2014, and ceased all operations as of March 7, 2015.

(Pls.' Resp. to Defs.' Facts, Dkt. No. 294, ¶ 47.)  Act II has not engaged in any business since March 7, 2015. (*Id.*)

When Act II decided to close shop, Wooten decided to open her own business in the same industry.  The crux of the dispute between the parties here is the propriety of Wooten's activities from the fall of 2014 to her termination date with Act II on February 9, 2015.  The parties tell very different stories of what occurred during this period.  The Court outlines each parties' rendition in turn.

According to Act II, Wooten used Act II's proprietary information to launch her new business, Adornable-U.  While she was still employed by Act II, Wooten covertly directed Act II designers Bonnie Jaekel and Abbey Johnson to spend Act II work time to develop designs for Adornable-U. (Dkt. No. 307, ¶ 12.)  She also coached Act II supplier La Radiant in its negotiations against Act II and secretly took Act II's jewelry styles, including pieces from the unreleased collection she and her team developed in 2014, and used them for Adornable-U. (*Id.*)  Wooten also took proprietary information from Act II prior to her termination.  She forwarded numerous e-mails and attachments from her Act II business account to her personal email account including proprietary information regarding the Spring/Summer 2015 collection, sales trends for Act II styles,

and other topics clearly related to the launch of her new business. (*Id.*)  While still employed and under contract with Act II, Wooten began operating Adornable-U's business by marketing Adornable-U to the public: she published Adornable-U's catalog online, registered and/or employed sales representatives to hold parties and take customer orders, and sold and distributed starter kits (containing actual product). (Dkt. No. 307, ¶ 13; Defs.' Reply to Pls.' Add'l Facts, Dkt. No. 334, ¶ 76.)  In short, in Act II's view, Wooten stopped working in the best interests of Act II and further took Act II's proprietary information to benefit her new business.  All of these activities, according to Act II, were undertaken without Act II's knowledge.  While Act II had been generally aware of Wooten's intention to start her own direct-sales jewelry business after Act II shuttered its doors, Act II expected that Wooten would not take any of its proprietary information and would not begin operating prior to concluding her work with Act II.

Wooten tells a very different story.  According to Wooten, she was always up front with Act II and its owners about her plans to continue in the business after Act II shut down.  In September 2014, Wooten disclosed to Act II that, in light of the fact that Act II was going out of business, she

wished to start her own company and enter into the direct-sales jewelry business. Wooten spoke with Act II personnel about her new business plans several times over the course of the next two months. Act II's owners expressed support and said they had no objection to Wooten starting her own direct-sales jewelry company and working with former Act II Sales Advisors. With Act II's blessing, Wooten incorporated Adornable-U, a direct-selling jewelry business on October 30, 2014.

According to Wooten, at no point during Act II's winding down process did she ever use or misappropriate any of Act II's trade secret information for the design or sourcing of Adornable-U's 2015 or its subsequent jewelry lines. (Dkt. No. 294, ¶ 33.) Wooten did not refer to or in any way use Act II's Spring/Summer 2015 "collection" in the selection or development of Adornable-U's jewelry lines or catalogs. (*Id.* ¶ 35.) To the contrary, Wooten selected and developed Adornable-U's 2015 and subsequent jewelry lines independently, using only information regarding those jewelry products and designs obtained from third-party vendors. (*Id.* ¶ 37.)

On January 20, 2015, things went awry. Wooten posted Adornable-U's first product catalog online. (Dkt. No. 307, ¶ 15.) According to Act II, Adornable-U's product catalog

contained Act II's work product because it included many
"carryover" jewelry items in Act II's Fall/Winter 2014 and
prior jewelry collections, as well as items that Act II's
designers had been designing in the fall of 2014, but that had
not yet appeared in an Act II published collection. (*Id.* ¶
16.)  After Adornable-U's catalog was published, the parties
attempted to negotiate.  Those negotiations were unsuccessful.
(*Id.* ¶ 19.)

On February 9, 2015, Act II notified Wooten that her
employment was terminated for cause.  (Dkt. No. 334, ¶ 81;
Dkt. No. 307, ¶ 24.)  On March 6, 2015, Adornable-U started
selling jewelry. (Dkt. No. 307, ¶ 30.)  From 2015 through
2017, Adornable-U sold 755 styles of jewelry. (Dkt. No. 334, ¶
93.)  Only 62 of those styles are at issue in this suit. (*Id.*)

Act II filed suit against Wooten and Adornable-U in the
Circuit Court of Cook County, Illinois on March 20, 2015,
which was subsequently removed to federal court. (Dkt.
No. 307, ¶ 32.) From March 2015 to August 2015, Act II sent
four letters to individuals associated with Adornable-U,
including actual and potential sale agents. (*Id.* ¶¶ 33-39.)
The letters advised the recipients of the pending lawsuit,
summarized the claims in the suit, and advised the recipients
of potential future discovery obligations. (*Id.* ¶¶ 33-39.)

The letters stated that "this lawsuit does not seek to block Ms. Wooten from operating a direct selling jewelry company" and that Act II and KEC were "not seeking to block [the letter's recipients] from representing [Adornable-U]." (*Id.* ¶ 33.) Act II contends these letters were necessary to assert its rights and advise the recipients of a litigation hold. (*Id.* ¶¶ 33-39.) Adornable-U disagrees, arguing that the letters were sent as a campaign explicitly and implicitly to threaten Adornable-U's actual and potential sales agents with a lawsuit if they continue working with Adornable-U. (Pls.' Resp. to Defs.' Add'l Facts, Dkt. No. 330, ¶ 19.) Additionally, Act II served 314 third-party subpoenas, many to Adornable-U sales agents, for documents and/or deposition testimony in this case. (*Id.* ¶ 22.) Adornable-U argues that Act II used the guise of discovery to threaten Adornable-U sales agents with suit if they continue working for Adornable-U.

Before the Court are Cross-Motions for Summary Judgment. The Court considers each claim in turn.

## II.  **ANALYSIS**

### A.  Standard of Review

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories and admissions on

file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it is one identified by the law as affecting the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015) (citing *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013)). On cross-motions for summary judgment, the Court draws inferences "in favor of the party against whom the motion under consideration was made." *Id.* (citing M*cKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008)).

### B. Breach of Fiduciary Duty

Act II moves for summary judgment on its claim that Wooten breached her fiduciary duties to Act II. To succeed, Act II must show that Wooten was a "key managerial employee" or agent of Act II and that she breached her fiduciary duties to Act II. *See, Sci. Accessories Corp. v. Summagraphics*

*Corp.*, 425 A.2d 957, 962 (Del. 1980) (Under Delaware law, key managerial employees and agents owe fiduciary duties to employer). Act II succeeds as to the former, but not the latter.

Wooten was a "key managerial employee" and agent of Act II during the relevant time period. Act II provides the following evidence through documents and deposition testimony: Wooten was in the "executive group" directly below the President; she ran the "Global Product Development and Merchandising" department; she regularly attended and presented at board meetings; she was privy to executive-level financial reports; she was the lead person in charge of selecting, designing and curating Act II's entire product line and interacted with Act II's vendors and suppliers; and she managed the pricing and costing of the jewelry. (Pls.' Facts, Dkt. No. 273, ¶¶ 5-6; Ex. AA, Dkt. No. 281 (Wooten's job description); Ex. KK, Dkt. No. 281 (Act II's organizational chart).) These facts satisfy Act II's burden as the movant and shifts the burden to Adornable-U. Adornable-U disputes these facts, citing Wooten's affidavit. (Dkt. No. 307, ¶ 5 (citing Wooten's Decl. ¶¶ 3-5).) Wooten avers that she was not a "key employee" at Act II, she was not a member of the executive management team as she reported the Executive Vice

President, Keith Maib, rather than the CEO, Victor Kiam, she had no knowledge or access to sensitive financial information, and she did not "design" jewelry for Act II. Wooten's statement that she was not a key employee is conclusory and will be disregarded. And even taking the other statements as true, Wooten would still be a "key managerial employee" of Act II as a matter of law. She does not dispute that she was a Vice President and ran the "Global Product Development and Merchandising" department, that she presented at board meetings occasionally, and that she was the lead person in charge of selecting and curating Act II's entire product line and interacted with Act II's vendors and suppliers and managed the pricing and costing of the jewelry. Even accepting that she was not a jewelry designer or the sole person responsible for managing the pricing and cost of jewelry, her role as Vice President of the "Global Product Development and Merchandising" department and its attendant responsibilities are sufficient to establish Wooten as a "key managerial employee." *See, Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980). Thus, no material dispute exists to preclude a finding that Wooten is in fact a "key managerial employee." Furthermore, Wooten puts forth no evidence to dispute her agency relationship with Act II.

Thus, Wooten was a "key managerial employee" and an agent of Act II during the relevant time period. Accordingly, Wooten owed Act II fiduciary duties. *See, id.*

However, summary judgment as to whether Wooten breached those duties is not warranted because issues of material fact abound. Wooten disputes nearly every material fact Act II cites on this score. This Court will not canvas the litany of disputed facts, but will offer a sufficient example. Act II claims that Wooten breached her fiduciary duties when she directed Act II designers Bonnie Jaekel and Abbey Johnson to spend Act II work time to prepare designs for Adornable-U and used those designs, along with Act II's trade secrets and resources for her new business. (Dkt. No. 273, ¶ 12.) She also used multiple Act II jewelry styles in Adornable-U's catalog, including pieces from the unreleased collection she and her Act II team developed in 2014. (*Id.*) Adornable-U disputes each contention, citing assertions to the contrary contained in Wooten's affidavit and deposition. (*See,* Dkt. No. 307, ¶ 12 (citing Wooten's Decl. ¶ 29); *Kaba v. Stepp,* 458 F.3d 678, 681 (7th Cir. 2006) ("Sworn affidavits, particularly those that are detailed, specific, and based on personal knowledge are 'competent evidence to rebut [a] motion for summary judgment.'" (quoting *Dale v. Lappin,* 376 F.3d 652, 655

(7th Cir. 2004)))).) In short, Wooten, Jaekel, and Johnson tell striking different stories about whether Wooten's work during Act's winding down process was for the benefit of Act II or Adornable-U. This dispute is material to the breach of fiduciary claim, and the jury will need to make a credibility determination between this presumably conflicting testimony. Another key disputed fact is whether any of Act II's work was taken and used by Wooten for Adornable-U. Act II presents evidence that Wooten emailed key documents to her personal account. (Dkt. No. 273, ¶ 13.) Although this gives rise to an inference in Act II's favor, the depositions and affidavits conflict as to whether those documents were used as part of Wooten's work for Act II or for her work for Adornable-U. (*Compare,* Dkt. No. 273, ¶ 13 *with* Dkt. No. 307; Wooten's Decl. ¶ 29.) The Court has no discretion to resolve disputed factual issues on a summary judgment motion. *See,* § 2728, Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2728 (4th Ed.) ("The duty of the court under Rule 56 is to determine whether a genuine dispute of material fact remains for trial; once it determines that a triable issue exists the inquiry is at an end and summary judgment must be denied."). Ample disputes of material fact exist here that will require the jury to evaluate conflicting testimony and witnesses credibility.

Thus, summary judgment must be denied on Act II's breach of fiduciary duty claim.

### C. Tortious Interference Claims

Act II also moves for summary judgment as to Defendants' multiple tortious interference claims, under which Adornable-U asserts that Act II tortiously interfered with its prospective economic advantage and with its contract rights by sending letters and subpoenas to actual and potential Adornable-U sales agents which deterred them from working for, or continuing to work for, Adornable-U. "The elements of tortious interference with a prospective economic advantage are: (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from being fulfilled; and (4) damages to the plaintiff resulting from the defendant's interference." *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 170-71 (7th Cir. 1993) (citing *Fellhauer v. City of Geneva,* 568 N.E.2d 870, 878 (Ill. 1991)). The elements of tortious interference with contract are parallel. The five elements are: (1) the existence of a valid contract between it and another; (2) defendant's awareness of the contract; (3) defendant's

intentional and unjustified inducement of a breach of the contract; (4) an actual breach of the contract; and (5) damages. *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.,* 192 F.Supp.3d 943, 958 (N.D. Ill. 2016).

However, certain communication is privileged "if the defendant acted in good faith to protect an interest or uphold a duty." *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 171 (7th Cir. 1993). This Court has already ruled that a qualified privilege attached to the letters and subpoenas in this case:

> The communications at issue here consisted of copies of the complaint and amended complaint, cease and desist/litigation hold letters, and subpoenas. These communications fit in two of the classes of communications that are subject to a qualified privilege. First, [Act II] made the communications to protect their contractual rights and intellectual property rights and interests, which they believed were being violated. [Act II] sought to prevent the continued sale of the disputed jewelry designs, and the letters and subpoenas were an attempt to preserve any evidence they may need to pursue their rights in court. Second, the communications advised the current and potential AU Sales Advisors of their duties and potential liabilities in light of the allegations against [Adornable-U]. Therefore, under the facts alleged, the Court concludes that the communications are subject to a qualified privilege.
>
> Because a qualified privilege attaches to the communications in question, [Act II Parties] are immune from tort liability based on these statements unless they are found to have abused this privilege.

(Memorandum and Opinion Order, Dkt. No. 95 at 18-19.)  Nothing since this Court's ruling has altered that conclusion.  Thus, a qualified privilege having been established, the plaintiff must prove that the defendant abused its privilege by acting with actual malice.  *Delloma v. Consolidation Coal Co.,* 996 F.2d 168, 172 (7th Cir. 1993).  "In order to demonstrate 'actual malice,' a plaintiff must establish that 'defendant had acted with a desire to harm which was unrelated to the interest he was presumably seeking to protect by bringing about the breach.'"  *Microsoft Corp. v. Logical Choice Computers, Inc.,* No. 99 C 1300, 2001 WL 58950, at *14 (N.D. Ill. Jan. 22, 2001) (quoting *Philip I. Mappa Interests, Ltd. v. Kendle,* 554 N.E.2d 1008, 1111-12 (Ill. App. Ct. 1990)).  Malice can be shown through evidence of unjustified statements, excessive publication, or by making statements in conflict with the interest which gave rise to the privilege."  *Delloma,* 996 F.2d at 172.  "While generally abuse of privilege is a question of fact for the jury, if the pleadings and attached exhibits present no genuine issue of material fact, the defendant is entitled to a judgment as a matter of law."  *Turner,* 706 N.E.2d at 518 (citations omitted).

It is undisputed that between March 27, 2015 and August 31, 2015, Act II sent four letters and multiple

subpoenas to actual and potential Adornable-U sales agents around the country. (Defs.' Add'l Facts, Dkt. No. 306, ¶ 17; Dkt. No. 273, ¶¶ 32-39.) Although the parties characterize the letters and subpoenas differently, the content of the letters and subpoenas is also undisputed. *Id.* Act II argues that the letters were sent for legitimate reasons: to assert its property rights and to give the recipients notice of a litigation hold. (Dkt. No. 273, ¶ 32-39.) Adornable-U contends, on the other hand, that Act II abused the qualified privilege for litigation-related mailings because the letters contained misstatements and were designed to scare away any Adornable-U sales agents under fear of a lawsuit. (Dkt. Nos. 306, 17, 19.)

However, the facts supporting malice are few. It is clear from the undisputed content of the letters and subpoenas that the communication was directly related to Act II's efforts to protect their legal interests. *See, e.g., Philip I. Mappa,* 554 N.E.2d 1008, 1013 (Ill. App. Ct. 1990) (no finding of malice where defendant distributed circular asking for support in his legal action against plaintiff). The letters advised recipients of Act II's asserted rights in the jewelry styles at-issue, summarized the lawsuit and its allegations, and informed recipients of their legal obligation

to preserve all information related to Adornable-U. (Exs. O, P to Compl.; Exs. 2-3 to Counterclaims.) The letters explicitly state that Act II did not seek to prevent the recipient from working with Adornable-U, but merely wanted to prevent any unauthorized sales of its work product. *Id.* Adornable-U contends that a wrongful purpose can be inferred because the letters and subpoenas were targeted at Adornable-U's top sellers and they were issued to potential agents who, having never worked for Adornable-U, could not possibly have sales information or other AdornableU-related documents. (Dkt. No. 330, ¶¶ 23, 25.) However, any agent that Adornable-U now claims is within the scope of its prospective economic advantage claim must necessarily have some connection to Adornable-U, meaning, correspondingly, that it is reasonable to think they may have Adornable-U information.

Here, the undisputed facts demonstrate that Act II's communications were related to protecting a legitimate litigation-related interest. *See, Microsoft Corp. v. Logical Choice Computers, Inc.,* No. 99 C 1300, 2001 WL 58950, at *14 (N.D. Ill. Jan. 22, 2001) (granting summary judgment on tortious interference claim where defendant's communication was privileged and plaintiff established no disputed fact supporting actual malice); *Disher v. Fulgoni,* 514 N.E.2d 767

(Ill. App. Ct. 1987) (holding former employer did not tortiously interfere with employee's prospective economic advantage by sending letter to prospective employer advising prospective employer of confidentiality agreement). In response, Adornable-U provides no facts that would allow a reasonable jury to find that Act II abused its privilege when sending the letters and subpoenas. *See, Turner v. Fletcher*, 706 N.E.2d 514, 519 (Ill. App. Ct. 1999) (affirming dismissal of tortious interference with contract because no facts could establish an abuse of privilege and no material dispute existed); *Certified Mech. Contractors, Inc. v. Wight & Co.*, 515 N.E.2d 1047, 1055 (Ill. App. Ct. 1987) (affirming grant of summary judgment where no factual support for the reasonable inference of actual malice); *see also Audition Div., Ltd. v. Better Bus. Bureau of Metro. Chi., Inc.*, 458 N.E.2d 115, 120 (Ill. App. Ct. 1983) ("Plaintiff's conclusory allegations that defendants were carrying out a 'personal vendetta' to destroy plaintiff are insufficient as a matter of law."); *cf. George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1333 (7th Cir. 1983) (plaintiff's assertions of defendants' "malice" and "conspiratorial interference," unsupported by any facts which show that defendants acted without justification or privilege, were insufficient to state

a claim). Certainly, the Court recognizes that even without malice, the letters and subpoenas might have negatively impacted Adornable-U's business and its relationship with its sales agents. Even so, no claim based on privileged communication can exist without a showing that the privilege was abused. There is no such showing here and thus summary judgment is warranted.

Summary judgment in Act II's favor is also warranted on another, independent ground: Adornable-U cannot establish its alleged lost profits with reasonable certainty as required by Illinois law. "[A]s a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery. This maxim is commonly referred to as the 'new business rule.'" *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007) (citations omitted). "The rule is based on the correct observation that it is more difficult to establish loss objectively when a business is strangled in its cradle, for then there is no history of profit and loss from which to extrapolate lost future profit." *Parvati Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013). The "new business rule" is not a hard-and-fast rule and the general rule may be overcome by sufficient evidence. *See, TAS Distrib.*, 491 F.3d at 633

(recognizing exceptions to the "new business rule"). For example, new businesses have successfully established lost profits by using historical data from similar franchise operations in similar locations, *see, Wilbern v. Culver Franchising Sys.*, No. 13 C 3269, 2015 U.S. Dist. LEXIS 130888, at *105 (N.D. Ill. Sep. 29, 2015), by using profits made by previous owners in the same business, *see, Fishman v. Estate of Wirtz*, 807 F.2d 520, 555-58 (7th Cir. 1986), and by establishing a profit history based on competitors' sales of the same product, *see, Milex Products, Inc. v. Alra Labs. Inc.*, 603 N.E.2d 1226, 1236-37 (Ill. App. Ct. 1992).

Adornable-U contends that it can establish its lost profits with reasonable certainty based on its two expert reports. (Dkt. No. 306, ¶¶ 1-11.) Hoffman's report used a conventional lost profit methodology and estimated the revenue each distributor would have generated for Adornable-U "but for" the alleged wrongful conduct. (Dkt. No. 306, ¶¶ 2-8.) However, what is noticeably absent from either report is an analysis of established profits from a business analogous to Adornable-U. (*See generally* Hoffman Expert Witness Report, Dkt. No. 308-4.) The expert report analyzes data from fourteen businesses that are not analogous to Adornable-U: All have significant international operations and only one of the

fourteen companies sells jewelry products, and even then not exclusively. (*See, id.*; Dkt. No. 330, ¶ 1; McDonough Rebuttal Report, Dkt. No. 330-2, Ex. 1 at 4-7.) Thus, even crediting Adornable-U's expert reports, Adornable-U fails to establish its alleged lost profits with evidence of profits from analogous, established business in the same industry. Rather, its experts calculate profits based on predictions of the loss of agents and other market data to estimate what Adornable-U would have made. (Dkt. No. 306, ¶¶ 1-11.) However, this type of analysis assumes a success not guaranteed to any new business. *See, Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000) (noting the high degree of uncertainty involved in any new venture). Adornable-U offers no analogous case that finds similar evidence sufficient. In fact, the weight of the case law finds that the "new business rule" applies where the plaintiff fails to use profits of analogous, established businesses to prove its damages. *See, Smart Marketing Group, Inc. v. Publications Int'l Ltd.*, 624 F.3d 824, 829-833 (7th Cir. 2010) (new business rule applied where evidence was not tied to performance of a "closely analogous businesses"); *TAS Distrib.*, 491 F.3d at 633-37 (new business rule applied where no facts showed the two businesses were "sufficiently comparable to warrant imputing [one company's]

sales to [the other company]"); *Kinesoft Development Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 909 (N.D. Ill. 2001) (new business rule applied where plaintiff failed to present "any analysis of a comparable company selling comparable [products]"); *Stuart Park Assocs. Ltd. P'ship v. Ameritech Pension Tr.*, 846 F. Supp. 701, 715 (N.D. Ill. 1994) (new business rule applied where parties attempted to build an apartment complex on new land and thus no adequate comparable existed to establish lost profits). In fact, courts have applied the new business rule even where plaintiff provided more comparable evidence than before the Court here. *See, Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 491 N.E.2d 912, 917 (Ill. App. Ct. 1986) (finding evidence insufficient to establish reasonable certainty even where plaintiff used evidence of its own later-earned profits after the defendant's tortious interference had ceased). Thus, the Court finds that Adornable-U's evidence on summary judgment simply cannot establish a basis upon which damages can be calculated to a reasonable degree of certainty. *See, TAS Distrib.*, 491 F.3d at 635-36. Accordingly, the speculative nature of the damages here provides a second, independent basis to award summary judgment to Act II on the tortious interference claims.

- 24 -

The Court therefore grants Act II summary judgment on Defendants' counterclaims of tortious interference with contract and Defendants' counterclaims of tortious interference with prospective economic advantage.

### D. Meads and Eckels' Tortious Interference Claims

There exists a separate, independent basis to grant summary judgment as to Mead and Eckles' Tortious Interference Claims. Although these claims fail for the reasons stated above, they also fail because Mead and Eckles are unable to establish that they had contracts with any agents. In response to summary judgment, Mead and Eckels cite two sources: Adornable-U's Counterclaim and their own declarations. As to the Counterclaim, a party cannot cite to allegations in its own pleading to escape summary judgment; summary judgment requires proof, not mere allegations. As to the declarations, both Meads and Eckels simply assert: "I entered into verbal contractual agreements with other independent contractors." (Exs. G, H to Dkt. No. 306.) These statements do not offer names or any documentary evidence to support these assertions. *See, Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 504 (7th Cir. 2004) ("[S]elf-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are 'without factual support in

the record.'" (quoting *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001)). Because these declarations are without factual support, they are insufficient to withstand summary judgment. Further, Adornable-U has admitted that agents do not enter into contracts with other agents. (*See,* Dkt. No. 307, ¶ 43 (not disputing that "[Adornable-U] policies also make clear that all commissions a sales agent might derive from other agents' sales were paid by Adornable-U. Agents did not enter into agreements with other agents.")) Accordingly, since agents do not enter into contracts with other agents, Mead and Eckels had no contractual relationship or any prospect for future contracts that could have been tortiously interfered with by Act II's conduct. For those reasons, summary judgment is granted to Act II as to all of Mead and Eckels' tortious interference claims.

The Court need not reach any of Act II's other arguments as to the tortious interference claims.

### E. Illinois Consumer Fraud and Deceptive Practices Act

Next, Act II moves for summary judgment on Adornable-U's counterclaim asserting that Act II violated the Illinois Consumer Fraud and Deceptive Business Practices Act. ("Consumer Fraud Act"), *see,* 815 ILCS 505/2 *et seq*. The Consumer Fraud Act is "intended to protect consumers,

borrowers, and business persons against fraud, unfair methods of competition, and other unfair or deceptive business practices." *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill. App. Ct. 2002). For a business to sue another business under the Act, the plaintiff must allege that the challenged conduct involves trade practices addressed to the market generally or trade practices that implicate consumer protection concerns. *ATC Healthcare Servs., Inc.,* 192 F.Supp.3d at 954. None of the communications at issue were addressed to the market generally because the letters and subpoenas were not published publicly as, for example, on a website. Rather they were communications sent to specific recipients. Nor does Adornable-U provide any explanation for how the alleged statements implicate consumer protection concerns. *See, Nakajima All Co. v. SL Ventures Corp.,* No. 00 C 6594, 2001 WL 641415, at *2-3 (N.D. Ill. June 4, 2001) (finding no nexus between consumer protection concerns where dispute involved only communications between businesses); *Am. Broad. Co. v. Maljack Prods., Inc.,* 34 F.Supp.2d 665, 680-81 (N.D. Ill. 1998) (granting summary judgment to defendant in a licensing dispute between media distributors where plaintiff failed to demonstrate a nexus); *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.,* 282 F.Supp.3d 1043, 1051 (N.D. Ill. 2017)

(finding no nexus between statements and consumer protections concerns); *IPOX Schuster, LLC v. Nikko Asset Management Co., Ltd.,* No. 15 CV 9955, 2018 WL 488260, at *10-11 (N.D. Ill. Jan. 20, 2018) (no consumer nexus where representations were directed at business entities).

Adornable-U's citation to *ABN AMRO, Inc. v. Capital International Ltd.,* 595 F.Supp.2d 805, 849-50 (N.D. Ill. 2008), is inapplicable because that case was decided at the motion-to-dismiss stage. At this stage, Adornable-U must come forward with evidence that the alleged conduct was "directed to the market generally" or "implicates consumer protection concerns." *ATC Healthcare Servs., Inc.*, 192 F. Supp. 3d at 954. Adornable-U contends the mass mailings were sent throughout the industry and marketplace, but cites no evidence supporting that fact. Instead, the evidence indicates the four letters and subpoenas were sent to specific actual or potential Adornable-U sales agents. Adornable-U argues that consumer protection concerns are implicated by these communications, which Adornable-U characterizes as efforts to put Adornable-U out of business, but that argument miscomprehends the nature of "consumer protection concerns" in this context. *See, Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 712 (N.D. Ill. 2006) (sending

seven letters to competitor's customers is the "type of focused communication" that "fails to implicate the kind of consumer protection concerns required to state a claim under [the Consumer Fraud Act]"). Finally, Adornable-U's argument that their agents often buy Adornable-U product and thus are also consumers does not preclude summary judgment. None of the communications were addressed to the agents in their capacity as potential consumers, but rather purely in their capacities as Adornable-U's sales agents. (Exs. O, P to Compl.; Exs. 2-3 to Counterclaims.) The Court awards summary judgment to Act II on the Consumer Fraud Act claim because the facts do not establish that the communications at issue were sent to consumers in the market generally or that they implicate consumer protection concerns.

### F. Illinois Wage Payment and Collection Act and Breach of Key Employee Incentive Bonus Agreement

Act II claims that summary judgment in its favor as to Wooten's breach of fiduciary duty also resolves Adornable-U's Illinois Wage Payment and Collection Act ("IWPCA") and breach of the Incentive Agreement claims in Act II's favor. Act II argues that a finding that Wooten breached her fiduciary duties justifies her termination for cause under the Key Employee Incentive Bonus Agreement and thus provides no basis for a claim under the Incentive Agreement or the IWPCA. It is

true that these claims likely fail if Wooten breached her fiduciary duties to Act II. However, as discussed above, issues of material fact exist as to whether she breached her fiduciary duties and thus, the factual predicate for summary judgment as to these claims is not present. Summary judgment is denied.

### G. Trade Secret Claim

In Illinois, a trade secret claim is a statutory claim governed by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*. The elements of a trade secret claim follow: (1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation. *Learning Curve Toys, Inc. v. Playwood Toys, Inc.,* 342 F.3d 714, 721 (7th Cir. 2003). ITSA defines a trade secret as: "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the

circumstances to maintain its secrecy or confidentiality."
765 ILCS 1065/2(d). A key factor in establishing whether
information is a trade secret "is the ease with which the
information can be readily duplicated without involving
considerable time, effort or expense." *RKI, Inc. v. Grimes,*
177 F.Supp.2d 859, 873 (N.D. Ill. 2001) (quoting *Stampede Tool
Warehouse, Inc. v. May,* 651 N.E.2d 209, 215 (Ill. App. Ct.
1995)). "The existence of a trade secret [under the ITSA]
ordinarily is a question of fact," which "is best resolved by
a fact finder after full presentation of evidence from each
side." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342
F.3d 714, 723 (7th Cir. 2003) (citation and internal quotation
marks omitted).

Adornable-U's main argument for summary judgment is that
Act II fails to identify specifically its trade secrets. (Dkt.
No. 294, ¶ 14.) Adornable-U complains that Act II's
interrogatories "identified" its trade secrets by referring to
9,825 pages of documents, including many documents that were
not confidential and held no proprietary information. (Dkt.
No. 294, ¶¶ 23, 30-31.) Such a pile of documents are unlikely
to meet the specificity requirements under the ITSA. *See,
Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d
1263, 1266 (7th Cir. 1992) ("[P]laintiff must show concrete

secrets."). However, Act II has done more here. Act II lays out in detail 74 alleged trade secrets in its fact response. (*See,* Dkt. No. 294, ¶ 14; *see also, Peerless Industries, Inc. v. Crimson AV LLC,* No. 11 CV 1768, 2015 WL 1275908, at *13 (N.D. Ill. Mar. 17, 2015) (finding plaintiff sufficiently identified its claimed trade secrets).) The Court need not go through all of the trade secrets but will use some as illustrations. Act II identifies its curated Spring/Summer 2015 Collection (the "SS15 Collection") and specifically identifies the name of each unreleased and modified carryover style for which it claims protection. (Dkt. No. 294, ¶ 14.) Act II also specifically identifies documents that Wooten downloaded from her work computer and/or emailed to her personal account containing proprietary information. (Dkt. No. 294, ¶ 14.) The documents themselves have been specifically identified (Dkt. Nos. 317-318, Exs. A-64-A-74) and include information concerning design standards, strategic plans, jewelry supplier data and cost information, carryover supplier information, selling trends, jewelry raw costs, vendor contact information, customer information, and hostess program comparison (a key component of the direct sales model). (Dkt. No. 294, ¶ 14.) Thus, Act II sufficiently identified its trade secrets.

Adornable-U next argues that the SS15 Collection cannot constitute a trade secret because the SS15 Collection is merely a combination of products that are bought on the open market and are thus generally known to the public. Certainly, products purchased from commercial vendors cannot constitute trade secrets by themselves. *See, U.S. Gypsum Co. v. LaFarge N. Am., Inc.,* 508 F.Supp.2d 601, 623 (N.D. Ill. 2007), *reconsidered in part by,* No. 03 C 6027, 2007 WL 2091020 (N.D. Ill. July 18, 2007). However, Act II does not claim that jewelry products bought on the market are trade secrets. Rather, Act II claims that it modified and curated these products and that the combination of modifications culminating in a curated collection created value and thus constitutes a trade secret. (Dkt. No. 294, ¶¶ 14, 33, 36; Dkt. Nos. ¶¶ 54-55.) Adornable-U contests this fact, claiming that the 2015 line was composed of "open line" products, which means products that were available for sale to anyone internationally. (Dkt. No. 268, ¶ 10, 33.) This factual dispute only highlights that summary judgment in not warranted in Adornable-U's favor. Furthermore, even if Adornable-U was correct in its assertion that each product individually could not be a trade secret that would not preclude the existence of a trade secret in the compilation of the collection:

> [A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*Syntex Ophthalmics, Inc. v. Novicky,* 745 F.2d 1423, 1434 (Fed. Cir. 1984), *judgment vacated on other grounds,* 470 U.S. 1047 (1985) (quotation omitted); *see also, 3M v. Pribyl,* 259 F.3d 587, 596 (7th Cir. 2001) ("These manuals and processes, even if comprised solely of materials available in the public domain, have been created by combining those materials into a unified system which is not readily ascertainable by other means."). Act II's employees developed the SS15 Collection over the course of approximately four months and expended significant time and effort to create the curated collection. (Dkt. No. 334, ¶ 65-68; *see, Bauknecht,* 71 F.Supp.3d at 840-42 ("[T]he ease with which trade secrets can be reproduced must be analyzed from the perspective of a person with no prior knowledge of the secret"); *Liebert Corp. v. Mazur,* 357 Ill. App. 3d 265, 277-79 (Ill. App. Ct. 2005) (information that would require significant time and expense to duplicate from scratch constitutes trade secrets).) The time and expense Act II invested in its SS15 Collection supports its status as a trade secret.

As for the confidentiality requirement, Adornable-U argues that Act II failed to take reasonable measures to protect the confidentiality of the SS15 Collection. Act II provides evidence that its employees who developed or had access to the jewelry collections were required to sign confidentiality, non-disclosure and developments agreements and other internal policies to maintain secrecy of its jewelry designs and to use password-protected, restricted access computer systems. (Dkt. No. 294, ¶ 62.) Adornable-U disputes all of this. (Dkt. No. 334, ¶ 62.) These factual disputes are material and will be left for the jury. *See, Motorola v. Lemko Corp.,* No. 08-CV-5427, 2012 WL 74319, at *18-20 (N.D. Ill. Jan. 10, 2012) ("[T]he Seventh Circuit [has a] clearly stated preference for resolution by a fact-finder of disputed trade secret issues, particularly the question of efforts to maintain secrecy."). Adornable-U also argues that Act II cannot establish that the information was secret where the information's value lies only in the eventual publication of that information. Certainly, once the SS15 Collection was published, it would have lost its trade secret status through public disclosure. However, it cannot be the rule that any product or information that will eventually be disclosed has no protection while it is in development.

To the next element: Adornable-U argues that Act II cannot establish misappropriation because Adornable-U never used any trade secret information in the design or sourcing of Adornable-U's 2015 or subsequent jewelry lines. (Dkt. No. 268, 33-39.) However, this fact is heavily disputed and more importantly, the law does not require "use" to prove misappropriation. "While proving unauthorized 'use' of a trade secret is one means of establishing liability under the ITSA, it is not the only means; liability also attaches for improper 'acquisition' or 'disclosure' of a trade secret." *Lane v. Brocq,* No. 15 C 6177, 2016 WL 1271051, at *13 (N.D. Ill. Mar. 28, 2016); *accord, Liebert Corp. v. Mazur,* 827 N.E.2d 909, 925 (Ill. App. Ct. 2005).

Act II provides evidence that Wooten took multiple documents containing sensitive information near the end of her employment by emailing them to her personal account and by downloading them onto portable drives. (Dkt. No. 294, ¶ 14; *see, First Fin. Bank, N.A. v. Bauknecht,* 71 F.Supp.3d 819, 846 (C.D. Ill. 2014) (finding suspicious timing of emails could allow a reasonable jury to conclude defendant misappropriated customer lists).) Act II also shows that materials on the development of the lia sophia Spring/Summer 2015 catalog were deleted from Act II's computer files as well. (Dkt. No. 294, ¶

14.)  Additionally, Act II provides evidence that the jewelry produced for Adornable-U is materially identical to Act II's jewelry, from which a jury could infer misappropriation. (Dkt. No. 294, ¶¶ 14, 76, 74-77, 83.)  Act II also offers testimony that Wooten instructed her employees to use Act II's jewelry to create Adornable-U's jewelry collections. (Dkt. No. 294, ¶¶ 14, 37).  Adornable-U disputes these facts.  (Dkt. No. 334, ¶¶ 14, 37, 74-77, 83.)  As such, whether Defendants misappropriated Act II information and whether that information was used in the production of Adornable-U's collection are questions of disputed fact for the jury to determine.  Viewing this evidence in the light most favorable to Act II, the Court concludes that Act II has demonstrated a genuine dispute of material fact.  Act II's trade secrets claim against Adornable-U and Wooten is appropriate for trial.

Adornable-U's trade secret argument is on firmer footing as to three other Defendants, Mead, Eckels, and Daun. Adornable-U points out that these Defendants did not have access to any of the material disclosing the Spring/Summer 2015 collection nor to Act II's sensitive documents, and Act II does not present evidence to the contrary. (Dkt. No. ¶ 38, 32, 41, 43-44.)  Act II's contention that these three

Defendants were given copies of the collection upon being served with the Complaint does not go to show that any of these Defendants misappropriated the material from Act II while it was still in business. (Dkt. No. 294, ¶¶ 38, 44.) Although Act II argues that Mead, Eckels, and Daun must have known they were using misappropriated trade secrets, Act II cites no admissible evidence indicating that any of them had such knowledge. Finding no reasonable jury could find in Act II's favor against Mead, Eckels, and Daun based on the evidence presented, the Court grants summary judgment as to the trade secrets claim as to those three Defendants. The trade secrets claim against Wooten and Adornable-U remains.

Lastly, Adornable-U argues that none of the Plaintiffs can assert a trade secret claim against Adornable-U because none of them satisfy Rule 17's real-party-in-interest requirement. This argument creates an absurd result. If this proposition were true, even assuming the claim was meritorious, no party could bring the claim here. Federal Rule of Civil Procedure 17(a)(1) states that "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). "[T]o be a real party in interest, the person must be the holder of the right or claim at issue." FED. R. CIV. P., advisory committee note YEAR. "There may be

multiple real parties in interest for a given claim. For example, when a party partially assigns the rights to a claim, 'the assignor and the assignee each retain an interest in the claim and are both real parties in interest.'" *Id.* Here, the facts indicate that the trade secret claims have been partially assigned, and thus Act II retains an interest in the claim, along with the entities that received the transferred assets. (Dkt. No. 334, ¶¶ 87-90.) Furthermore, the two purposes served by Rule 17—protecting defendants from subsequent claimants and ensuring preclusive effect of the judgment—do not counsel a different result here. *See,* 1 FED. R. CIV. P., Rules and Commentary Rule 17. Thus, we need not reach the question whether ownership is required to bring a trade secret claim. *But see, DTM Research, L.L.C. v. AT & T Corp.,* 245 F.3d 327, 332 (4th Cir. 2001) (holding ownership of trade secrets unnecessary to bring claim where party possessed trade secrets); *Metso Minerals Indus. v. FLSmidth-Excel LLC,* 733 F.Supp.2d 969, 978 (E.D. Wis. 2010) (following *DTM* and holding that a company that sold all trade secret rights but retained a non-exclusive, royalty-free right to continue to use the trade secrets had standing to sue for trade secret misappropriation). Accordingly, this Court denies summary

judgment in Adornable-U's favor on Act II's trade secret claim.

### H.  Breach of Key Employee Incentive Bonus Agreement

Adornable-U moves for summary judgment on Act II's claim that Wooten breached the Key Employee Incentive Bonus Agreement. Adornable-U argues that it is entitled to summary judgment because that Agreement is unenforceable as Act II has no legitimate business interest in the contract's enforcement now that it is out of business. "A restrictive covenant, assuming it is ancillary to a valid employment relationship, is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo,* 965 N.E.2d 393, 396 (Ill. 2012). Enforceability is a legal question. *Frazier v. Dettman,* 569 N.E.2d 1382, 1386 (Ill. App. Ct. 1991). Adornable-U argues that Act II fails the first and second requirement.

Before considering this claim in depth, the Court must dispose of a threshold argument. Act II argues that *Reliable Fire* and the standard it espouses is restricted to non-compete provisions and thus does not apply. Although public policy

looks with a more stringent eye on non-competes, all post-employment restrictive covenants are analyzed under the same standard. *See, Cronimet Holdings, Inc. v. Keywell Metals, LLC,* 73 F.Supp.3d 907, 915 (N.D. Ill. 2014) (noting "validity and enforceability [of NDA] is analyzed in essentially the same way as if it were a covenant not to compete"); *Avison Young-Chicago, LLC v. Puritz,* No. 17 C 0844, 2017 U.S. Dist. LEXIS 196189, at *9 (N.D. Ill. Nov. 29, 2017) (analyzing a confidentiality and no-raiding provision as restrictive covenant); *Carlson Grp., Inc. v. Davenport,* No. 16-cv-10520, 2016 U.S. Dist. LEXIS 171915, at *9 (N.D. Ill. Dec. 13, 2016) (analyzing confidentiality and non-solicitation agreement as restrictive covenant).

The protection of confidential business information is generally considered a legitimate business interest. *Reliable Fire Equip. Co. v. Arredondo,* 965 N.E.2d 393, 401 (Ill. 2011) ("[E]mployer has a legitimate business interest in restraining the employee from appropriating the employer's confidential trade information."). However, Adornable-U argues that Act II fails this requirement here because, as it has closed its jewelry-selling shutters, it no longer has an operating business to protect. True, Act II has not engaged in business since March 7, 2015, but the alleged breach occurred prior to

that date. (Dkt. No. 294, ¶¶ 47, 74, 83, 85). Act II is not litigating whether the Agreement is currently in effect, but rather a claim for damages based on Wooten's breach of the Agreement while Act II was still in business and winding up its affairs. *Id.* Act II legitimately may seek to protect the financial outcome of its wind-up process and the value of its assets which it was in the midst of selling. Furthermore, Act II transferred its assets to KEC, which is still operating, and KEC has a legitimate business interest in protecting its alleged trade secrets. The Release and Waiver attached to the Incentive Agreement required Wooten to "refrain . . . from disclosing any trade secret of [KEC] or Act II or other confidential and proprietary business information and material." (Dkt. No. 294, ¶ 61.) Thus, KEC may enforce any breach under the Incentive Agreement, because Act II's rights were assigned and the agreement specifically contemplated protecting KEC's assets as well. *See, id.*; *see also* Memorandum and Opinion Order, Dkt. No. 90 at 17 (rejecting argument that agreement was unenforceable where agreement specifically contemplated Act II winding down).

Second, Adornable-U argues that the contract is unenforceable because it is overly broad and would impose undue hardships on Wooten. Adornable-U maintains that the

Restrictive Covenants, if enforced, would essentially preclude Wooten from engaging in the jewelry business. This argument falls flat. As Adornable-U itself points out, the Incentive Agreement specifically provides that nothing in that Agreement or the Restrictive Covenants "shall prevent Employee from continuing her work as a jewelry designer, as long as employee does not infringe on any of intellectual property belonging to the Company." (Facts ¶ 51.) Regardless of Act II's construction, the Incentive Agreement speaks for itself. It precludes Wooten from using Act II's trade secrets and confidential information in her continued work as a jewelry designer. It does not pretend to limit Wooten from continuing in her chosen field. Merely preventing a former employee from using their former employer's confidential information is not overly broad or unduly burdensome, and especially not here, in light of the carve out that allows Wooten to continue working in her chosen field.

Wooten's Motion for Summary Judgment on Act II's claim that she breached the Incentive Agreement claim is denied.

### IV.   <u>CONCLUSION</u>

For the reasons stated herein, Adornable-U's Motion for Summary Judgment and Act II's Motion for Summary Judgment are granted in part and denied in part. Act II's Summary Judgment

Motion is granted as to the tortious interference claims and the Illinois Consumer Fraud claim, but denied as to the breach of fiduciary duty claim, breach of Incentive Agreement claim and the Illinois Wage Payment and Collection Act claim. Defendants' Motion for Summary Judgment on Act II's trade secret claims against Mead, Eckels, and Daun is granted. The rest of Defendants' Motion is denied.

**IT IS SO ORDERED.**

 

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 7/11/2018